Filed 1/4/16  In re C.R. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re C.R. et al., Persons Coming Under the Juvenile Court Law. | B262729<br><br>(Los Angeles County<br>Super. Ct. No. CK73437) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>C.C.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite Downing, Judge.  Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica M. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

C.C. (grandmother) was the legal guardian of her daughter's two children, C.M.R. and C.C.R. While grandmother was incarcerated after allegedly stabbing a man in the parking lot of a bar, she left the children with her live-in boyfriend, D.H. The Department of Children and Family Services (DCFS) discovered the arrangements for the minors' care after a therapist working with C.M.R. took him home to an empty house. The therapist stayed, saw D.H. drive up and enter, and believed D.H. was under the influence of alcohol. D.H. initially lied to the therapist about grandmother's whereabouts, but the therapist overheard D.H. in a phone conversation say grandmother was incarcerated.

DCFS detained C.M.R. and C.C.R., and filed a petition under Welfare and Institutions Code section 387,[1] alleging that grandmother's incarceration and plan for D.H. to care for the children placed the children at risk. The court found the allegations true, ordered the children to remain in foster care, and ordered reunification services. Grandmother appealed, arguing that the evidence was insufficient to sustain the lower court's findings. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

C.M.R. was born in 2005 and C.C.R. was born in 2007. The children's parents were drug abusers and the children were removed from their care in 2008. The children were initially placed with their maternal grandmother, appellant C.C., but were later removed to foster care after DCFS realized grandmother had a history with DCFS relating to issues when the children's mother was a teenager. Grandmother voluntarily attended parenting classes and obtained a completion certificate. The children again were placed in grandmother's care in May 2009. In February 2010, grandmother and her then-husband were named the children's legal guardians. Grandmother and her husband later divorced, and grandmother remained the sole legal guardian of the children.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

On December 3, 2014, a therapist working with C.M.R. noted that he was yelling, cursing, and "having a very bad day." The therapist asked whether C.M.R. wanted to call grandmother and go home, but C.M.R. replied, "There is no point, my Grandma isn't home." The therapist took C.M.R. home at about 1:30 p.m. but no one was home, so C.M.R. "had to sneak into the home through his [C.M.R.'s] bedroom window." Later, grandmother's boyfriend, D.H., arrived at the home. The therapist noted that D.H. "was 'drunk' and just arrived to the home by driving himself." When a social worker later asked the therapist how he knew D.H. was drunk, the therapist responded that he "could smell the alcohol on the boyfriend," D.H. was "slurring," and his "eyes were a little glossy." While the therapist was there, D.H. "appeared to be 'trying to sober up.'" D.H. reported that grandmother "left abruptly to care for her ex boyfriend" but she did not take any belongings or her cell phone. The therapist later overheard D.H. say in a phone conversation that grandmother was incarcerated.

The following day, December 4, 2014, the therapist called the Child Abuse Hotline and reported concerns about the children. When asked why he had not reported the incident the day before, the therapist responded that he wanted to check with his supervisor to determine if it was a reportable issue, and he did not think C.M.R. was in danger of being hurt. The therapist also noted that grandmother usually is present for C.M.R.'s therapy sessions.

A DCFS social worker went to grandmother's house the same day to follow up on the report. D.H. reported that he had been living with grandmother for about a year. D.H. admitted that grandmother was incarcerated, and that she was charged with assault with a deadly weapon. He told the social worker that grandmother was due to appear in criminal court the following day and he anticipated that she would be released following the court appearance.

DCFS detained the children. The children reported that they did not know anything about grandmother's whereabouts. The children denied any cruelty, hitting, inappropriate touching, drug use, or domestic violence; they reported that for discipline, they were sent to their rooms. They were placed in foster care.

3

DCFS obtained police reports showing that grandmother had been arrested on Tuesday, November 18, 2014. She and D.H. were involved in a fight in a bar parking lot with a man named Greg. According to the police report, D.H. and Greg exchanged punches, while grandmother shouted at Greg, "You mother fucker! You don't mess with my boyfriend! I'll kill you!" Greg reported that grandmother knocked out his tooth by hitting him in the mouth with a metal object, which may have been the handle of a knife; the tooth was later found in the parking lot. Then Greg saw grandmother "jabbing a knife toward his face." He grabbed grandmother's hand holding the knife, but "[a]s [grandmother] jabbed the knife toward [Greg], the end of the blade of the knife contacted the skin below his left eye, leaving a puncture mark on his skin." After the fight ended, grandmother again threatened Greg with a different knife, saying, "I'm going to kill you! I'm going to cut your face." The police report noted that Greg was "intoxicated with alcohol" at the time of the report, but nonetheless able to articulate the events "in a concise and descriptive manner." Other witnesses confirmed the events, including a bartender who also noted that grandmother used two different knives during the assault.

Police went to grandmother's house to question her about the incident. She stated that she and D.H. arrived at the bar at about 2:30 p.m. Surveillance video indicated that the fight occurred around 4:45 p.m. Grandmother admitted that after D.H. and Greg fought, she "pointed a knife at" Greg to "keep [him] away from her." Police arrested her for stabbing Greg.

DCFS filed a petition under section 387[2] on December 9, 2014. The petition

---

[2] Section 387 states, in part, "(a) An order changing or modifying a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution, shall be made only after noticed hearing upon a supplemental petition. (b) The supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3."

4

alleged that the previous disposition "has not been effective in the protection or rehabilitation of the child." The supporting facts, in full, state: "On 11/18/2014, the children, [C.M.R.] and [C.C.R.'s] legal guardian, [grandmother], was incarcerated due to Force or Assault with a Deadly Weapon not Firearm: Great Bodily Injury likely. The legal guardian made an inappropriate plan for the children's ongoing care and supervision in that the legal guardian left the children in the care of the legal guardian's male companion, [D.H.], who on 12/03/2014, was under the influence of alcohol while the children were in his care and supervision. Such an inappropriate plan for the children's care and supervision by the legal guardian endangers the children's physical health and safety, and creates a detrimental home environment, placing the children at risk of physical harm and damage."

The minute order for the detention hearing on December 9 notes, "guardian present in custody." The court ordered that the children remain in foster care and attend monitored visits with grandmother. The court ordered a "multidisciplinary assessment of the child and family," as well as reunification services.

A Pre-Release Investigation Report dated December 23, 2014, included further information about the home and family. It noted that the home was clean and orderly with ample space for the children. It stated that a roommate (not D.H.) living in one of the bedrooms "has a criminal history for Possession of controlled substances," and as a result, "he expressed not wanting to get involved in the case." The report also noted that a live scan for D.H. showed he was convicted in 2005 for driving under the influence of alcohol. He was ordered to complete a drug and alcohol program and did so. The report stated that the conviction "will need to go through the waiver process before ASFA[3] approves the home." D.H. expressed that he loved the children and was willing to do whatever DCFS required to have the children return to the home. The children said they

---

[3] Presumably this means that the home would need to be approved under the Adoption and Safe Families Act of 1997, which establishes the federal guidelines for foster care and relative care placements. (See 42 U.S.C. § 670 et seq.)

5

love D.H. and wanted to continue living with him. Grandmother later proffered the December 23 report as evidence at the jurisdiction/disposition hearing.

A jurisdiction/disposition report dated January 20, 2015, stated that grandmother was released from jail on December 13, 2014. She expected to return to criminal court on February 2, 2015 "for a re-trial, because she refused the two plea bargains that has [sic] been offered to her – an eight year prison sentence or a year at a local jail with probation time." She expressed that Greg, the alleged victim, had falsely accused her and she preferred to "take my chances with the jury." The report noted that grandmother had a "no-show drug test result" on December 19, and D.H. had a "diluted drug test result" on December 23.

The January 20 report also included information from the office of the therapist who initially reported that D.H. was drunk while caring for the children. Before the December 3 incident with D.H., the therapist had no concerns about domestic violence or alcohol abuse at the home. After the incident, grandmother "called the agency to express her upset at the referral having been made and because of the resulting detention of the children following her release from jail." Following the call, "the therapeutic treatment team will no longer work with the legal guardian [grandmother] as a result, and . . . the team will be changed once the children return home, to avoid a hostile therapeutic environment for the child [C.M.R.]."

A supplemental report dated February 25, 2015 stated that grandmother's criminal arraignment had been continued to March 4. It also noted that grandmother and D.H. had submitted three additional drug tests each, and all results were negative. It also stated that C.M.R. and his foster mother had seen grandmother at a bar when they went to a local meat market. D.H. later explained that they were at the bar celebrating a friend's birthday. The report also stated that during two visits with the children, grandmother was "reported to have the smell of alcohol on her." The report further stated that a former therapist who worked with C.M.R. more than a year before the children's current detention said that "the maternal grandmother only participated in the child [C.M.R.'s]

6

treatment as her social life or other commitments permitted." DCFS proffered the January 20 and February 25 reports as evidence at the jurisdiction/disposition hearing.

At the jurisdiction/disposition hearing on February 25, grandmother argued that the children were in D.H.'s care for less than a month, and because they were no longer in his care the petition should be dismissed. She also made clear that she and D.H. were willing to comply with all alcohol testing, classes, and other requirements DCFS required. DCFS argued that grandmother exercised poor judgment by getting into a bar fight, smelling of alcohol at monitored visits, and being at a bar "recently during the day" when C.M.R. and his foster mother saw her. DCFS also pointed to the former therapist's statements that grandmother did not consistently participate in C.M.R.'s therapy.

The court found "that the previous disposition was not effective in the protection of the children." It found that the allegations true and sustained the section 387 petition. The court acknowledged that grandmother was currently out of custody, but noted that the DCFS reports indicated that grandmother has an issue with alcohol, so that "alcohol continues to be a challenge for her and yet she denies it's a problem." The court further found that under section 361, subdivision (d), it was detrimental to the physical and emotional well-being of the children to remain in grandmother's care, and there were no reasonable means to protect them without removing them from her care. The court ordered reunification services. The court also ordered grandmother to do a full alcohol program with after care, a 12-step program, random alcohol testing, and individual counseling.

Grandmother timely appealed.

## STANDARD OF REVIEW

In a case involving section 387, we review the court's jurisdictional and dispositional findings for substantial evidence. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.) Under this standard, "[w]e do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order and affirm the order even if other evidence supports a contrary finding." (*In re T.W.*,

*supra*, 214 Cal.App.4th at pp. 1161-1162.) The appellant has the burden of showing that the order is not supported by substantial evidence. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## DISCUSSION

Grandmother's primary argument on appeal is that "the evidence is insufficient to sustain the petition under Welfare and Institutions Code section 300, subdivision (g), and the failure to allege jurisdiction under other subdivisions requires that the petition be dismissed." Although grandmother acknowledges that "the purposes of section 300 are different from section 387," she argues that there is "some logic in looking at some of the principles underlying section 300, particularly those involving the various grounds under which children may be declared dependents."

Grandmother's reliance on section 300 is misplaced. The purpose of section 300 "is to identify those children over whom the juvenile court may exercise its jurisdiction and adjudge dependents." (*In re Joel H.* (1993) 19 Cal.App.4th 1185, 1200.) "[W]hen, as in the present case, there is a supplemental petition, there already exists a basis for juvenile court jurisdiction. The law does not require that a fact necessary to establish jurisdiction under section 300 be established to warrant a change in placement." (*Ibid*.) "The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1161.) Grandmother's argument that the court below erred in failing to make adequate findings under a section 300 standard is therefore unavailing.

Grandmother focuses on section 300, subdivision (g), which provides a basis for jurisdiction if "the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child." (§ 300, subd. (g).) Grandmother argues that because she was "not incarcerated at the time the court heard the section 387 petition," "[t]here was no evidence presented that she was not able to care for the children or was unable to select an appropriate caregiver."

Grandmother cites *In re Christopher M.* (2014) 228 Cal.App.4th 1310, a section 300 case, in support of her argument. In that case, the petition alleged that the "'[father]

8

has failed to provide the child with the necessities of life including food, clothing, shelter and medical care. The father's whereabouts is [sic] unknown.'" (*In re Christopher M.*, *supra*, 228 Cal.App.4th at p. 1319.) In fact, at the time of the hearing the "father was out of prison, employed, living with paternal grandmother in San Diego (who had been having unmonitored weekend visits with Christopher for some time) and was consistently visiting Christopher. In addition, father was in an anger management program and individual counseling, and was willing to pay for conjoint counseling with Christopher. Most significantly, father wanted custody of Christopher." (*Ibid.*) The Court of Appeal stated that based on these facts, "There was no evidence that, at the time of the jurisdiction/disposition hearing, father was unwilling to provide Christopher with the necessities of life." (*Ibid.*) The court held that under the circumstances, section 300, subdivision (g), did not apply: "Section 300, subdivision (g) applies only when the parent is unable to provide or arrange for care at the time of the hearing." (*Id.*, at p. 1320.) Because the father was available at the time of the hearing, he did not fit the statutory language of a parent who is "incarcerated or institutionalized and cannot arrange for the care of the child." (§ 300, subd. (g).)

*Christopher M.* does not stand for the blanket proposition grandmother asserts—a "core principle[ ]" that unless a parent is incarcerated at the time of a hearing, jurisdiction is necessarily improper. Importantly, *Christopher M.* did not involve section 387; rather, it involved a question of jurisdiction under section 300, subdivision (g), which does not apply in a section 387 case. (See *In re A.O.* (2010) 185 Cal.App.4th 103, 110.) As discussed above, the issues relevant to a section 387 petition are necessarily different than questions relating to jurisdiction under section 300.

Moreover, even if the analysis of *Christopher M.* were applicable in the section 387 context, that case is nonetheless distinguishable on its facts. There, the father was available and willing to care for his son at the time of the hearing. Here, by contrast, grandmother reported to DCFS that she could be facing incarceration for eight years as a result of the criminal charge, which had not yet been adjudicated. Grandmother's ability to care for the children at the time the 387 petition was filed and immediately following

9

the disposition hearing was therefore very much in question. The court was not required to ignore that reality and consider only whether grandmother was incarcerated on the day of the hearing.

Grandmother also argues that "the evidence fails to show that [D.H.] was an inappropriate choice" to care for the children while grandmother was incarcerated. She argues that because the therapist who called DCFS said that he did not feel that the children were in immediate danger and therefore left C.M.R. with D.H., "the therapist was quite clear [that D.H.] was capable of caring for the children and he had no concerns for their safety."

Grandmother's argument disregards the views of the DCFS social workers who detained the children the following day, as well as the subsequent DCFS reports. There is no legal basis to defer to the therapist's view of the situation as opposed to that of the social workers. To the contrary, under the substantial evidence standard, we do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or weigh the evidence. Instead, we draw all reasonable inferences in support of the lower court's findings and affirm the order even if there is some contradictory evidence. (*In re T.W.*, *supra*, 214 Cal.App.4th at pp. 1161-1162.)

Here, there was ample evidence to support the court's order under the substantial evidence standard. Grandmother was arrested for getting into a violent bar fight at 4:45 on a Tuesday afternoon. She was charged with a felony. While she was incarcerated for several weeks (November 18 to December 13) she left the children with D.H., but C.M.R. had to climb through a window to gain access to the home. C.C.R. was not yet home from day care when the therapist observed D.H. arriving home glossy-eyed, slurring his words, smelling of alcohol, and "trying to sober up." When DCFS investigated, they found that a renter living in the home had a criminal history involving controlled substances and was not interested in complying with DCFS requirements. D.H. himself had a past felony conviction for driving under the influence of alcohol, which needed to be cleared before he could be deemed an appropriate caregiver. And at the time of the hearing, the disposition of grandmother's criminal case was still pending and it was

10

unclear whether she would be sentenced to significant prison time for allegedly stabbing Greg. Based on the facts before the court, there was ample evidence to find that "the previous disposition has not been effective in the rehabilitation or protection of the child." (§ 387, subd. (b).)

Grandmother also argues that the court erred by considering grandmother's fitness as a caregiver, rather than reviewing only her plan for the care of the children while she was incarcerated. Because the section 387 petition alleged that grandmother's plan for the children's care was inadequate, she argues, the court had no basis for considering the circumstances of grandmother's alleged criminal acts, her own potential alcohol abuse issues, or whether her care of the children was inadequate before she was arrested.

The section 387 petition states that grandmother was "incarcerated due to Force or Assault with a Deadly Weapon not Firearm: Great Bodily Injury Likely." Grandmother cites no authority indicating that the court was required to ignore the circumstances of the crime—including the fact that grandmother was in a bar fight at 4:45 on a weekday afternoon—in determining whether the children's placement with grandmother was sufficiently protecting them. Grandmother also cites no authority indicating that the court was required to ignore the findings of DCFS investigations following the filing of the section 387 petition, including grandmother's potential problems with alcohol and how those issues might affect the children. Moreover, given the evidence relating to D.H.'s intoxication while caring for the children, his intoxication while driving, his criminal history, and the renter's criminal history, any consideration of grandmother's fitness as a caregiver was unnecessary to the court's determination that the previous disposition was ineffective in protecting the children. Grandmother's arrest, impending incarceration, and the unfitness of D.H. as a caregiver supported the court's findings, even without considering the additional evidence that grandmother visited the children smelling of alcohol and was again seen at a bar in the middle of the day.

Under section 387, "[t]he parent [or guardian] need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child. (*In re Jamie M*. (1982) 134 Cal.App.3d 530, 536.)"

11

(*In re T.W., supra,* 214 Cal.App.4th at p. 1163.) Here, substantial evidence supported the court's finding that the children's placement with grandmother while she was incarcerated and facing further incarceration was not sufficiently effective in protecting the children under section 387, and that intervention was needed to avert harm to the children.

## DISPOSITION

Affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, Acting P. J.


MANELLA, J.

12