Filed 7/16/14; pub. order 8/15/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re CHRISTOPHER M., a Person Coming Under the Juvenile Court Law. | B251097 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK85289) |
| Plaintiff and Respondent, | |
| v. | |
| CHRISTOPHER M., SR., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Stephen Marpet, Juvenile Court Referee. Reversed and remanded.

Karen B. Stalter, under appointment by the Court of Appeal, for Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Respondent.

_____

Christopher M., Sr., (father) appeals from the order adjudicating his son, Christopher M., (Christopher) a dependent child pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (g) and the ensuing disposition order.[1] Father contends there was no substantial evidence to support jurisdiction based on father's alleged conduct. We reverse and remand.

## FACTUAL AND PROCEURAL BACKGROUND

Christopher is the youngest of five half-siblings: S. (born in 1994), David (born in 1999), Ruben (born in 2000) and Devin (born in 2004).[2] Mother and father were married but father was incarcerated when Christopher was born in December 2006.[3] Father is identified on Christopher's birth certificate. Mother did not maintain contact with father after she discovered that he had been intimate with another woman before he went to prison. Unbeknownst to mother, father obtained a divorce from mother sometime in late 2010 or early 2011 while he was still incarcerated and in 2011 father remarried.

Meanwhile, father was still incarcerated on November 17, 2010, when Christopher and his half-siblings came to the attention of DCFS as the result of a referral alleging that mother physically abused then six-year-old Devin. All five children were detained. Mother denied knowing father's whereabouts (or the whereabouts of the half-siblings' fathers). DCFS filed a petition which, as to father, alleged he failed to provide

---

[1] All future undesignated statutory references are to the Welfare and Institutions Code.

[2] The half-siblings each have a different father. Except for Christopher's, none of the other fathers participated in the dependency proceedings. All of the half-siblings lived with mother, except for Serina, who lived with maternal grandmother.

[3] In 1996, father was arrested and later convicted of second degree murder but in 2006, the conviction was reduced to manslaughter and he was sentenced to 10 years time served. Mother was pregnant with Christopher in June 2006, when father was arrested for criminal threats and sentenced to 92 months in prison. After violating parole in June 2007, father was incarcerated again.

Christopher with the necessities of life (paragraphs b-9, g-5) (§ 300, subds. (b) & (g)).[4] All five children were placed with maternal grandmother.

Paternal grandmother appeared at the adjudication hearing on January 26, 2011, and informed the juvenile court that father was in prison. The hearing was continued to March 8, 2011, for father's appearance. The next day, father signed a form waiving his right to appear, but checked the box authorizing his attorney to represent him at the hearing.

According to the report for the continued adjudication hearing, father expected to be released from prison in October 2012. While incarcerated, father had seen Christopher about six times. He had not had any relationship with mother since 2006. Father wanted paternal grandmother to represent him in the dependency proceedings, and wanted Christopher placed in a safe place, with family. Father requested visitation at the prison. Paternal grandmother and a paternal uncle appeared at the March 8, 2011 adjudication hearing. Finding father to be only an alleged father, the juvenile court did not appoint counsel to represent him. It sustained the failure to provide allegations of the petition relating to father and ordered no reunification services for him. Paternal grandmother was given overnight and weekend visits with Christopher.

In September 2011 letters to the juvenile court judge and the social worker, father asked for a court-appointed attorney. Father asked to be reunified with Christopher. He was concerned that mother was not progressing in her case plan and maternal grandmother's deteriorating health made Christopher's placement with her not in his best interests. Father asked that Christopher be placed with paternal grandmother and that father receive reunification services. Although his prison did not offer parenting classes, father described other relevant programs in which he had participated because he believed they would make him a better parent.

---

**4** Similar allegations were made as to all five fathers. As to mother, the sustained petition alleged she physically abused Devin (paragraphs b-1 & b-2); mother and her male companion engaged in a physical altercation in the presence of the children (paragraph b-4). Father does not challenge jurisdiction based on mother's conduct and mother is not a party to the appeal.

Mother stopped visiting the children in March 2012. In mid-April 2012, seven-year-old half-sibling Devin was hospitalized and placed on a three-week psychiatric hold after he became so angry when asked to share a toy with Christopher that he bit Christopher, physically attacked maternal grandmother and attacked both the social worker and police officers. Diagnosed with Disruptive Behavior Disorder, Mood Disorder NOS and Impulse Control Disorder NOS, Devin was prescribed medication and returned to maternal grandmother's home. On April 22, 2012, mother was arrested for second degree robbery.

According to the report for the May 23, 2012 status review hearing, father had written letters to Christopher, who was then five years five months old. A contested section 366.22 permanency review hearing was set for July 24, 2012. The report for that hearing stated that mother was homeless and wanted maternal grandmother appointed the children's legal guardian or, alternatively, that maternal grandmother adopt them. Following the hearing, a section 366.26 permanent plan selection and implementation hearing was set for November 20, 2012. The juvenile court ordered DCFS to address visitation for paternal grandmother. The grandmothers subsequently agreed upon bi-weekly weekend visits for paternal grandmother, and to split holidays.

Father was released from prison on October 23, 2012. After DCFS learned that father was seeing Christopher during paternal grandmother's visits, DCFS arranged monitored visits for father on November 7 and November 13, 2012. DCFS reported that father was attentive and patient during these visits. Christopher was becoming receptive to father's presence. Father appeared at the .26 hearing and was appointed counsel. The hearing was continued to March 19, 2013, pending which father was given twice weekly monitored visits and DCFS was ordered to assess father's status in the case.

Over the next five months, father visited Christopher five times. On March 19, 2013 (the day of the .26 hearing), the juvenile court granted father's section 388 petition seeking to be found Christopher's presumed father, and to have the jurisdictional and dispositional orders vacated on the grounds that father had not received proper notice of the hearings on November 23, 2010 (detention), January 26, 2011

4

(jurisdiction/disposition), and March 8, 2011 (continued jurisdiction/disposition). Adjudication of the section 300 petition's allegations against father was continued to May 21, 2013.

Father's visitation became more consistent. Father's work schedule prevented him from attending a family meeting to discuss visitation but he told the social worker that he was happy with the existing visitation schedule and felt paternal grandmother could adequately represent his interests at the meeting. When the social worker arrived unannounced at father's visit on April 25, Christopher was with a paternal uncle and father was not present. When father arrived 45 minutes later, accompanied by a female child about the same age as Christopher, father told the social worker that he was delayed at work. The social worker observed that father interacted more with the female child than with Christopher. Christopher referred to father as "Big Chris" and did not recognize him as his father; Christopher was not affectionate toward father and seemed more comfortable with the paternal uncle. The adjudication hearing was continued so that father and Christopher could participate in joint counseling.

On August 2, 2013, father relocated to San Diego to live with paternal grandmother. By the time of the continued adjudication hearing on August 28, 2013, father had obtained employment with a construction company and had enrolled in an anger-management program in San Diego. Father's Los Angeles therapist, whom father had been seeing since February 2013, gave father a positive prognosis; father had located a new therapist in San Diego. Father had been visiting consistently with help from his mother and brother, who together managed to get Christopher from Los Angeles to San Diego and back again (because father was on probation in San Diego, he was apparently not allowed to travel to Los Angeles). Christopher, then six years eight months old, told the social worker that he did not enjoy spending time with father. DCFS recommended continued reunification services to give father more time to bond with Christopher. Father did not testify at the adjudication hearing on August 28, 2013. His counsel argued that circumstances had changed in the almost two years since the petition had been filed: "The father is not currently incarcerated. He's willing to and able to take custody of his

5

child and that will also be his request." The juvenile court sustained paragraphs b-9 and g-5 of the petition, which both alleged that father failed to provide Christopher with the necessities of life including food, clothing, shelter and medical care. Father timely appealed.

**DISCUSSION**

*A.    Father's Appeal Is "Justiciable"*

DCFS contends we should decline to address father's challenge to the jurisdictional findings based on his conduct, because there is no challenge to the jurisdictional findings based on mother's conduct. We elect to exercise our discretion to consider father's appeal because the challenged findings will have consequences to father beyond jurisdiction.

"An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490-1491.) The juvenile court exercises jurisdiction with respect to a child when the child has been endangered in any manner described by section 300; it acquires personal jurisdiction over the child's parents through proper notice. (*Id.* at p. 1491.) "Parental personal jurisdiction allows the court to enter binding orders adjudicating the parent's relationship to the child." (*Ibid.*; see § 361, subd. (a)(1) ["In all cases in which a minor is adjudged . . . a person described by section 300, the court may limit the control to be exercised over the dependent child by any parent . . . ."].) Where, as here, a father challenges the evidentiary support for jurisdictional findings based on his conduct, but does not challenge the jurisdictional findings based on the mother's conduct, the appellate court may decline to address father's challenge. This is because the juvenile court "will still be entitled to assert jurisdiction over the minor on the basis of the unchallenged allegations. Further, the court will still be permitted to exercise personal jurisdiction over Father and adjudicate his parental rights, if any, since that jurisdiction is derivative of the court's

6

jurisdiction over the minor and is unrelated to Father's role in creating the conditions justifying the court's assertion of dependency jurisdiction." (*I.A.* at p. 1492.) However, where the jurisdictional finding could have other consequences beyond jurisdiction – e.g. where the finding may exclude the parent as a placement option – the appellate court has discretion to consider the question. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Relevant to this case is section 361.2, subdivision (a), which governs placement of a dependent child with a noncustodial parent.[5] It provides: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Placement under section 361.2 is a two-step process. Under subdivision (a) of that section, the juvenile court first determines whether temporary placement with the non-custodial parent would be detrimental to the child. Under subdivision (b), the court determines whether the placement should be permanent and dependency jurisdiction terminated. (*In re John M.* (2013) 217 Cal.App.4th 410, 420-421.)

Although the term "nonoffending" does not appear in the text of section 361.2, subdivision (a), some courts have recognized "an implicit nonoffending requirement in section 361.2." (*In re John M., supra*, 217 Cal.App.4th at pp. 421 et seq.; see *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1245 [under § 361.2, "[i]f there is no showing of detriment, the court must order the [Department] to temporarily place the child with the nonoffending noncustodial parent."].) Other courts have found placement pursuant to section 361.2, subdivision (a) does not require the noncustodial parent to also be non-

---

**5** Section 361, subdivision (c)(1), which governs placement with a non-offending custodial parent, is inapplicable because Christopher never lived with father. (*In re I.A., supra*, at p. 1494.)

offending. (See, e.g., *In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1504 [§ 361.2, subd. (a) does not exclude from consideration for placement a noncustodial parent with a history of prior involvement with child dependency proceedings]; *In re V.F.* (2007) 157 Cal.App.4th 962, 966 ["section 361.2 does not distinguish between an offending and nonoffending parent"], superseded by statute on other grounds, as stated in *In re Adrianna P.* (2008) 166 Cal.App.4th 44, 57–58.). But even assuming that section 361.2, subdivision (a) does not include an implicit "non-offending" requirement, a jurisdictional finding based on conduct of a noncustodial parent would unquestionably be a consideration in assessing detriment under section 361.2, subdivision (a). (*Nickolas T.,* at p. 1506, fn. 10.)

Because jurisdictional findings based on father's conduct could reasonably have consequences to consideration of father for placement under section 361.2, subdivision (a), we exercise our discretion to consider father's challenge to those jurisdictional findings.

**B.**     *The Jurisdictional Findings Against Father Were Not Supported By Substantial Evidence*

Father contends no substantial evidence supports the jurisdictional findings under section 300, subdivisions (b) and (g) based on his conduct. We agree.

We begin with the standard of review. "At the jurisdictional hearing, the dependency court's finding that a child is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355, subd. (a); [citation].) We review the dependency court's jurisdictional findings for substantial evidence, and review the evidence in the light most favorable to the dependency court's findings and draw all reasonable inferences in support of those findings." (*In re John M., supra*, 217 Cal.App.4th at p. 418.) We turn next to the substantial evidence question.

**1.     Section 300, Subdivision (b)**

8

In relevant part, there is a basis for jurisdiction under section 300, subdivision (b) if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . *the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment* . . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b), italics added.)

To establish jurisdiction under section 300, subdivision (b), the risk of serious physical harm or illness from failure to support must exist at the time of the adjudication hearing. (*Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662, 673 (*Maggie S.*).) In *Maggie S.*, the mother was incarcerated while pregnant with A.C. Before A.C. was born, mother designated a maternal uncle and a family friend, Mary K., as prospective caregivers for A.C. Five days after A.C. was born, the maternal uncle told the social worker that he did not want to be A.C.'s caregiver. But Mary K. said she was willing to take A.C. (*Id*. at pp. 666, 672.) The detention and jurisdiction/disposition reports inaccurately stated that mother named Mary K. only after the maternal relatives declined to take A.C., and that the social worker was unable to make contact with Mary K. Based on those inaccurate reports, the juvenile court found A.C. to be a person described by section 300, subdivisions (b) and (g) because mother " 'was incarcerated and "made an inappropriate plan for the child's ongoing care and supervision in that the child's maternal uncle, and the maternal grandparents, are unwilling to provide care of the child." ' " (*Maggie S.*, at pp. 672, 667.) The appellate court reversed, reasoning that jurisdiction under section 300, subdivision (b) was not supported at the time of the hearing because mother had designated Mary K., Mary K. was willing to care for A.C. and there was no evidence that A.C. would be at substantial risk of serious physical harm or illness based on failure to provide care if placed with Mary K. (*Id*. at p. 673.)

Here, the juvenile court sustained paragraph b-9 of the petition, which alleged "[father] has failed to provide the child with the necessities of life including food, clothing, shelter and medical care. The father's whereabouts is unknown. Such failure to

9

provide for the child on the part of the father endangers the child's physical and emotional health, safety and well being and places the child at risk of physical and emotional harm and damage." None of these allegations as to father were supported by the evidence available to the juvenile court at the time of the jurisdiction/disposition hearing on August 28, 2013. By that date, father was out of prison, employed, living with paternal grandmother in San Diego (who had been having unmonitored weekend visits with Christopher for some time) and was consistently visiting Christopher. In addition, father was in an anger management program and individual counseling, and was willing to pay for conjoint counseling with Christopher. Most significantly, father wanted custody of Christopher. There was no evidence that, at the time of the jurisdiction/disposition hearing, father was unwilling to provide Christopher with the necessities of life. As such, there was no evidence to support the finding of jurisdiction under section 300, subdivision (b) based on father's alleged failure to support.

### 2. Section 300, Subdivision (g)

Section 300, subdivision (g) provides a basis for jurisdiction if the child "*has been left without any provision for support;* . . . the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, *the whereabouts of the parent are unknown*, and reasonable efforts to locate the parent have been unsuccessful."[6] (§ 300, subd. (g), italics added.)

Section 300, subdivision (g) applies only when the parent is unable to provide or arrange for care *at the time of the hearing*. (*In re J.O.* (2009) 178 Cal.App.4th 139, 153.) "The statue requires proof that appellant was unable to arrange for care at the time of the hearing, not that he had failed to do so at some prior point in time." (*In re Aaron S.*

---

[6] Although father was incarcerated when dependency proceedings began, the petition alleged only a failure to provide support; it did not allege father was incarcerated and unable to arrange for care, or that mother, with whom father left Christopher, was unable to provide care or support.

10

(1991) 228 Cal.App.3d 202, 210 [juvenile court erroneously focused on incarcerated father's failure to make arrangements for child's care before DCFS removed child from mother].) If the child must be removed from the custodial parent, the issue under section 300, subdivision (g) is whether the noncustodial parent can either take physical custody, or can arrange for another caregiver. (*Id.* at p. 212, fn. 10 ["under the proper construction of [§ 300, subd. (g)], the question is whether appellant was able to arrange for the child's care at the time of the hearing].) In *Maggie S., supra*, 220 Cal.App.4th at page 667, the appellate court found insufficient evidence to support jurisdiction under section 300, subdivision (g), reasoning that mother's designation of Mary K. before A.C.'s birth, and Mary K.'s willingness to care for A.C., were sufficient to compel a conclusion that at the time of the jurisdiction/disposition hearing, mother had arranged a caregiver for A.C.

Here, the juvenile court sustained paragraph g-5 of the petition, which alleged jurisdiction under section 300, subdivision (g) based on father's failure to provide Christopher with the necessities of life. But the evidence was undisputed that, at the time of the jurisdiction/disposition hearing, father was out of prison, employed and wanted custody of Christopher. Even if the juvenile court found giving custody of Christopher to father was not in Christopher's best interest, there was no evidence that father could not make other arrangements for Christopher's care, including with the paternal grandmother who already had an established relationship with Christopher, or even with the maternal grandmother with whom Christopher was already placed. That placing Christopher with father might not yet (or ever) be in Christopher's best interests, is not relevant to the only issue under section 300, subdivision (g) – whether father was able to arrange for Christopher's care at the time of the jurisdiction/disposition hearing.

## DISPOSITION

The jurisdictional order as to Christopher based on father's alleged conduct is reversed, as is the dispositional order. The matter is remanded to the juvenile court for a new dispositional hearing as to Christopher at which the court should consider placement

11

with father pursuant to section 361.2, subdivision (a).  We express no opinion on a proper disposition order.


                                        RUBIN, J.

WE CONCUR:


        BIGELOW, P. J.


        FLIER, J.

12

Filed 8/15/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re CHRISTOPHER M., a Person Coming Under the Juvenile Court Law. | B251097 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK85289) |
| Plaintiff and Respondent, | |
| v. | |
| CHRISTOPHER M., SR., | |
| Defendant and Appellant. | |

THE COURT:

IT IS HEREBY ORDERED that the opinion filed in the above matter on July 16, 2014, is certified for publication with no change in judgment.

_____

_

BIGELOW, P. J.          RUBIN, J.          FLIER, J.

13