Filed 2/2/16  In re C.C. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re C.E. et al., Persons Coming Under the Juvenile Court Law. | B265088 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK68052) |
| Plaintiff and Respondent, | |
| v. | |
| T.J., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Robert S. Draper, Judge.  Dismissed in part and affirmed in part.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

T.J. (Mother) appeals from juvenile court jurisdiction and disposition orders. Although the juvenile court sustained a dependency petition that claimed jurisdiction over mother's six children was necessary under Welfare and Institutions Code section 300, subdivision (b),[1] based on three separate factual allegations, mother challenges only two of the court's findings:  that mother's abuse of marijuana placed her children at risk of harm, and that mother's failure to protect one child from physical abuse by mother's boyfriend endangered the child and placed all of the children at risk of harm.  Mother does not challenge a third finding that her relationship with a violent boyfriend exposed the children to domestic violence, endangered them, and placed them at risk of harm. Mother also challenges a disposition order requiring her to undergo random drug testing. Because mother challenges only a portion of the jurisdiction order, we find that portion of her appeal not justiciable.  We affirm the disposition order.

**FACTUAL AND PROCEDURAL BACKGROUND**

Beginning in November 2012, mother and her six children—C.E. (10 years old), F.E. (7 years old), S.S. (5 years old), J.P. (4 years old), S.P. (2 years old), and F.M. (7 months old)—were the subject of a voluntary family maintenance case.  The Department of Children and Family Services (DCFS) opened a voluntary case to address concerns of general neglect.  According to referrals, there were reports that the family's home, C.E., and F.E. smelled of urine.  There were also reports that mother had not followed through with referrals for F.E. to an optometrist, and referrals for S.S. to a regional center for a possible speech delay.[2]

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Between 2011 and 2013, the agency received four referrals concerning the family. In 2011, a referral was received alleging mother left the children alone in a filthy motel room.  The referral was closed as unfounded.  In 2012, someone reported the children were frequently absent from school, were hungry, smelled of urine and were dirty. The report also alleged mother left the children with a friend for what was supposed to be one night, then mother did not return for a week.  The referral was closed as inconclusive after DCFS was unable to locate the family.  Later that year, DCFS received a referral alleging physical abuse or risk of physical abuse.  According to the referral, mother had

2

In June 2013, mother's boyfriend, Juan C., was living with the family. On June 6, 2013, while mother, Juan, and the children were at a Burger King restaurant, Juan slapped S.S., leaving a red mark on her face. The police were called. They noted the injury to S.S.'s face and warned Juan not to hit the children again. Juan denied slapping S.S. He told police he only pulled S.S.'s ear because she did not want to leave the play area when it was time to eat. A subsequent police report indicated the officers discussed child abuse laws with mother and Juan. The incident was reported as "no crime suspected."

After the incident, DCFS was unable to make contact with the family. C.E. and F.E. were absent the last two days of school before the summer vacation began. Mother canceled a June 5, 2013 appointment with a family preservation social worker; he was then unable to make contact with the family. Mother's telephone number was disconnected. On June 13, 2013, a case social worker went to mother's home. An apartment manager let the social worker into the apartment. It appeared mother had packed some of the family's belongings and left others.

_____

asked for F.E. to be hospitalized for her aggressive behavior toward her siblings. Mother also said she needed a break because she had recently given birth to F.M. The referral alleged mother's home smelled of urine and did not have food, furniture, or a refrigerator. DCFS deemed the physical abuse allegations "inconclusive" and reported there were "no indications or observations of physical abuse." However, the allegation of general neglect was deemed "substantiated," and mother agreed to a voluntary family maintenance case. When an anonymous neighbor called DCFS in January 2013 and reported mother neglected the children, kicked them, and the house was "a mess," DCFS concluded the allegations were unfounded and were contrary to what a social worker had observed. DCFS noted general neglect concerns due to mother's failure to make regional center or optometrist appointments, and the urine smell on C.E. and F.E., were already being addressed in the voluntary family maintenance case.

On June 19, 2013, DCFS received information from Salvador M., who identified himself as F.M.'s biological father.[3] Salvador informed DCFS that mother smoked marijuana during their one-year relationship and her refusal to stop led to their breakup three months earlier. Salvador further reported that the last time he had seen mother, around one and a half months earlier, he noticed syringes in her purse and marks on her arms. When he questioned her, mother said the syringes were for a friend who was diabetic and the marks were mosquito bites. Salvador suspected mother may have been using heroin. He had also seen her in the company of a man Salvador suspected used heroin because of marks on his arms.

As of July 1, 2013, the family had not been located. DCFS filed a petition alleging mother's substance abuse (of marijuana) endangered the children's physical health and safety and placed them at risk of harm and damage (count b-1). The petition also alleged Juan C. physically abused S.S., mother failed to protect S.S. because she knew of the abuse and allowed Juan to reside in the family home and have unlimited access to S.S., and Juan's abuse and mother's failure to protect S.S. endangered her physical health and safety, and placed her and her siblings at risk of physical harm, damage, danger, and physical abuse (counts b-2, j-1).

In an interview on July 11, 2013, Salvador M. told DCFS mother smoked marijuana weekly while pregnant with F.M. He also reported she smoked in the presence of the other children, and would leave for four to five days at a time. According to Salvador, mother took no responsibility for the children and instead made C.E. take care

---

[3]     Genetic testing conducted later in the case revealed Salvador M. was not, in fact, F.M.'s father. Mother had consistently maintained Salvador could not be F.M.'s father because she never had sexual relations with him and they broke up in December 2011. According to mother, while Salvador was visiting her in the hospital after she gave birth to F.M. in November 2012, he signed his name on the birth certificate without mother's consent and while she was momentarily absent, attempting to find out the correct spelling of the name of F.M.'s father, Erwin G. Mother claimed she had the necessary paperwork to correct F.M.'s birth certificate, but she had never submitted the documents.

of her younger siblings, or left it to him to provide care during the three months they lived together.

In July 2013, the juvenile court issued a protective custody order for the children. The family was missing until August 2014, when they were located in Alabama. DCFS retrieved the children from Alabama in late August. In March 2015, DCFS filed an amended petition alleging counts b-1 and b-2 as in the original petition, and adding count b-3. Count b-3 alleged Juan C. engaged in a violent altercation with mother in the presence of the children; mother failed to protect the children because she allowed Juan to have contact with them; Juan was previously arrested on a domestic violence charge yet mother allowed him to return to the family home without filing a restraining order; and such violent conduct and mother's failure to protect the children endangered their physical health and safety and "place[d] [them] at risk of physical harm, damage, and failure to protect."

In interviews for a March 2015 jurisdiction and disposition report, mother explained she believed that although she was participating in a voluntary family maintenance plan in 2012, she could leave whenever she pleased. She decided to move the family to Tijuana for a few months. They returned to Los Angeles between January and April 2014, then went to Alabama, where life had "always been better" for her and the children. In February 2015, mother married Henry B. in Alabama. They were living in a 5 bedroom home. Mother detailed years of moving around the country, often to get away from an abusive or drug-using spouse or partner.[4] Mother denied ever using any

---

[4]     Mother told DCFS her first husband punched her while she was pregnant, causing her to miscarry. They divorced in 2000 due to domestic violence. Mother's first two children were removed from her custody by DCFS. Eventually mother's parental rights were terminated in 2003. A relationship with her first husband's uncle ended in August 2006 because he demeaned and belittled her. This was F.E.'s father. Mother ended a relationship with S.S.'s father because he was involved with drugs. In 2006, mother moved from Illinois to Tennessee because of problems with the maternal grandfather and F.E.'s father, and allegedly false reports to child protective services. Mother moved to Alabama in 2007 and remarried. She gave birth to J.P. and S.P. Mother and this husband separated due to domestic violence; the children were briefly removed from her custody

type of drugs, including marijuana.  She said she had ended relationships with men upon realizing they used drugs because she did not want drugs around her children.

Mother said that when the June 2013 incident with Juan C. and S.S. happened, she was inside the restaurant ordering food and Juan and S.S. were outside.  She did not realize S.S. had a mark on her face until police arrived.  Mother also asserted she would never allow any man to hit her children and she therefore had ended her relationship with Juan.  Mother admitted Juan had subjected her to domestic violence for around one month, and that at least two incidents had occurred in the presence of the children.  She said other incidents happened while the children were asleep or in another room.  She never called the police because she was afraid of Juan.  He threatened to kill her, the children, and himself if she called the police.  Mother said she had a restraining order against Juan, but still feared for her safety when in Los Angeles because of Juan's gang connections.

Eleven-year-old C.E., the oldest child, reported mother used marijuana "once or twice . . . or a few times," when they lived in Los Angeles.  She described mother using a glass pipe to smoke.  The pipe was always in mother's bedroom on Juan's side of the bed or in Juan's pocket.  C.E. said the children were not allowed into the bedroom.  C.E. recalled mother smoked in a room with Salvador M. and with Juan C.  Mother told C.E. it was mother's medication.  After smoking, mother was " 'just mainly tired and she would look sleepy.' "  Nine-year-old F.E. said she never saw mother smoke or use drugs.  Seven-year-old S.S. said mother "no longer did drugs," recalling that she one time asked mother why mother no longer smoked.  Mother replied: "[B]ecause I got off."  S.S. recalled Juan smoked with "a green thing that looked like plastic," and on three occasions

_____

because of the domestic violence issues.  In 2011, mother moved to California to get away from J.P. and S.P.'s father.  C.E. was able to visit with her father, until he spanked her, causing mother to cut off contact with him.  She began dating Juan C. while pregnant with F.M.  They began living together in March 2012.  DCFS later discovered that mother's new husband Henry B., had been convicted of a domestic violence crime.

6

S.S. saw mother and Juan with the "green thing" in the front yard. Six-year-old J.P. said mother never used drugs or smoked cigarettes.

As to the Burger King incident, C.E. recalled S.S. saying "something about getting hit in the face." C.E. saw that S.S. had a red cheek. C.E. had been inside the Burger King with mother, while S.S. was outside with Juan. C.E. could recall no other incidents of Juan hitting S.S. or the other children. F.E. said she knew nothing about anyone hitting any of her siblings. S.S. recalled an incident that occurred when she was at Burger King with mother's boyfriend. She said she had forgotten everything except that she had a bruise on her face.

However, C.E. had seen Juan choke and slap mother. She told DCFS she and her siblings saw Juan engage in violent conduct against mother. When they cried and told him to stop, Juan would take mother into the bedroom and continue there. F.E. claimed to remember nothing. S.S. said mother was always screaming and fighting with her boyfriends, and mother had been married five times. S.S. said she believed mother's boyfriend hurt her because she remembered hearing a lot of screaming. J.P. recalled one man slapping mother.

At the April 2015 jurisdiction and disposition hearing, mother testified she had never used drugs and did not even drink socially. She claimed past drug tests were negative. She admitted Juan hit S.S. but denied that she was aware of the slap until after it happened. Mother testified she promptly removed her family from Juan by moving them all to Mexico, where they stayed until she ran out of money. They returned to Los Angeles and stayed only until mother had the money to move them back to Alabama. Mother had run into Juan since June 2013, but only incidentally. During a run-in in November 2014, Juan threatened her. In a chance encounter in March 2015, Juan hit her. In April 2015, mother secured a permanent restraining order against Juan, however he had not yet been served. Juan had only been served with a temporary order of protection. Mother said she had to hide from Juan to keep him from pursuing her.

7

The juvenile court sustained the amended petition in its entirety. At disposition, the court declared the children dependents of the court, and found by clear and convincing evidence there was a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being if the children were returned to the parents' custody, and there were no reasonable means to protect the children without removal.[5] The court-ordered case plan required mother to undergo ongoing random or on demand consecutive drug tests. Mother timely appealed.

## DISCUSSION

### I.     Mother's Challenge to the Jurisdiction Order is Not Justiciable

The juvenile court asserted dependency jurisdiction over the children, pursuant to section 300, subdivision (b), and based on three factual allegations it found true. Count b-1 alleged mother abused marijuana, and that abuse rendered her incapable of caring for the children and placed them at risk of physical harm. Count b-2 alleged Juan C. abused S.S., mother failed to protect S.S. from the abuse, and both Juan's abuse and mother's failure to protect placed the children at risk of physical harm. Count b-3 alleged Juan engaged in a violent altercation with mother in the presence of the children, mother failed to protect the children by allowing him to have contact with them and by allowing him to return to the family home without securing a restraining order, and Juan's and mother's conduct placed the children at risk of physical harm. Mother challenges the jurisdiction order only as to counts b-1 and b-2, which she argues were not supported by substantial evidence. She expressly does not challenge jurisdiction to the extent it was based on the true finding on count b-3.

As DCFS argues, and mother acknowledges, it is well established that when there are multiple grounds for the assertion that a minor comes within the jurisdiction of the dependency court, the reviewing court may affirm the finding of jurisdiction if any one of the statutory bases for jurisdiction is supported by substantial evidence. In such cases,

---

[5]    It appeared that only two of the six children have the same biological father. Three of the children's fathers participated in the jurisdiction and disposition hearing through counsel. All were out of state. One was incarcerated.

the reviewing court need not consider other challenged jurisdictional findings. (*In re I.J.* (2013) 56 Cal.4th 766, 773-774; *In re J.C.* (2014) 233 Cal.App.4th 1, 3-4 (*J.C.*); *In re Francisco D.* (2014) 230 Cal.App.4th 73, 80; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) Thus, when a parent challenges only one of several bases for jurisdiction, the threshold issue is one of justiciability. A reviewing court's decision on the challenged bases for jurisdiction will not result in a reversal of the juvenile court's order asserting dependency jurisdiction over the child. Thus, the reviewing court is unable to grant effective relief, rendering the challenge not justiciable. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1489, 1491-1493 (*I.A.*).)

Yet, a reviewing court may exercise its discretion to reach the merits of the parent's argument when "(1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150, citing *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 (*Drake M.*).) Thus, for example, courts have frequently exercised this discretion in cases where the parent's appeal, if successful, would eliminate all jurisdictional findings against that parent, potentially affecting the court's placement and custody decisions. (See e.g., *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1316-1317; *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613; *Drake M., supra*, 211 Cal.App.4th at pp. 762-763.)

In this case, however, all three counts alleged facts that would cause the children to be found persons described by a single statutory basis, section 300, subdivision (b). Reversal of the findings on counts b-1 and b-2 would not render mother "nonoffending." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 309-310 (*Briana V.*) [distinguishing *Drake M.* where there were multiple allegations against father rather than a single jurisdictional finding].) Count b-2, which mother challenges, and count b-3, which she does not, both significantly relied on allegations that mother was engaged in a relationship with a violent and abusive man, and mother exposed the children to that violence. Further,

9

mother has not identified any specific legal or practical consequences that might flow from the juvenile court's findings on counts b-1 and b-2. (*J.C., supra,* 233 Cal.App.4th at p. 4.)

Instead, mother asserts only generally that the findings have the potential to impact future dependency or family court proceedings. There is no indication in the record that family law proceedings were impending, or even likely.[6] Mother's assertion that the findings on counts b-1 and b-2 will potentially impact future dependency proceedings ignores that jurisdiction would remain under count b-3, based on allegations very close in nature to those underlying count b-2, specifically her exposure of the children to the violent conduct of her romantic partner. Indeed, mother fails to establish how the potential impact to her in any future family law or dependency proceedings would be ameliorated by a reversal of the court's findings on counts b-1 and b-2, while count b-3 remained, establishing a valid basis for dependency jurisdiction based on mother's conduct. (*Briana V., supra*, 236 Cal.App.4th at pp. 310-311; *I.A., supra*, 201 Cal.App.4th at pp. 1494-1495.) Moreover, the only portion of the disposition order mother challenges is the requirement that she undergo random drug testing. For reasons discussed further below, the juvenile court could properly make this order, irrespective of a finding basing jurisdiction on mother's alleged marijuana abuse.

Mother does not challenge the jurisdictional finding based on her exposure of the children to domestic violence, a finding that was amply supported in the record. We conclude this is not an appropriate case for us to exercise our discretion to review jurisdictional findings addressing two forms of neglectful conduct under section 300, subdivision (b), when a third form of conduct establishing jurisdiction under section 300, subdivision (b) is unchallenged on appeal.

---

[6] None of the children's fathers had been involved in their lives prior to the proceedings. Only one of the three fathers participating in the jurisdiction and disposition hearing was unaware of his child's existence prior to the instant dependency proceedings. The two fathers who knew of their children had not initiated family law proceedings regarding the children, even the father to whom mother was married.

**II.    The Juvenile Court Did Not Abuse its Discretion in Ordering Mother to Submit to Drug Testing**

"At the dispositional hearing, the juvenile court must order child welfare services for the minor and the minor's parents to facilitate reunification of the family. (§ 361.5, subd. (a); Cal. Rules of Court, rule 1456(f)(1).) The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion. [Citations.] We cannot reverse the court's determination in this regard absent a clear abuse of discretion." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 (*Christopher H.*).)

The juvenile court need not focus only on the content of the sustained dependency petition when making dispositional orders in the best interests of the children. (*In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1183.) Even if the juvenile court finds an allegation to be not proven for purposes of a jurisdictional order, at disposition the court has the discretion to address any issue that may be an obstacle to reunification. (*Christopher H., supra*, 50 Cal.App.4th at pp. 107-108.)

Here, regardless of whether the evidence established mother had abused marijuana or that mother's drug abuse had harmed the children or placed them at substantial risk of harm, there was evidence that her drug use could pose an obstacle to her reunifying with the children. There was evidence mother had smoked marijuana, she did so while pregnant and in the presence of the children, and that she had disappeared for days while using the substance. There were reports that she was involved frequently with men who used drugs. Mother herself confirmed this by noting the relationships she had ended because of a partner's drug use. C.E. told DCFS when mother smoked she became tired; there were also reports that mother had difficulty taking responsibility for the care of the children and she instead left it to C.E. to care for her siblings. Mother, on the other hand, denied that she had ever used marijuana, testimony the juvenile court found not credible.

In light of this evidence, the juvenile court was well within its discretion in ordering drug testing as one facet of a plan to assist mother in reunifying with her children, irrespective of a finding basing jurisdiction on mother's drug abuse.

11

## DISPOSITION

Mother's challenge to counts b-1 and b-2 is dismissed. The disposition order is affirmed.

BIGELOW, P.J.

We concur:

FLIER, J.

GRIMES, J.

12