Filed 3/10/26  In re N.V. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re N.V., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU, Petitioner and Respondent, v. L.V., Objector and Appellant. | A173712 (Contra Costa County Super. Ct. No. J24-00392) |

This juvenile dependency case arose out of a domestic violence incident in which the appellant, L.V. (mother), was arrested for a brief period and then released with no charges. The dependency court returned the then five-year-old child to mother's custody but exercised jurisdiction after finding that mother's inability to protect the child from domestic violence placed the child at risk of harm.  (See Welf. & Inst. Code, § 300, subd. (b)(1)(A).)[1]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

Appointed counsel for mother filed a no issues brief and mother lodged a statement challenging the dependency court's orders. (See *In re Phoenix H.* (2009) 47 Cal.4th 835, 843-844.) Based on our independent review of the record, we invited the parties to file supplemental briefs on whether, inter alia, the dependency court's jurisdictional order was supported by substantial evidence. We now reverse.

## BACKGROUND

### A.

The Contra Costa Children and Family Services Bureau initiated the dependency petition after mother was arrested in July 2024 in connection with an altercation she had with her ex-boyfriend, David, on July 10, 2024. The couple had recently decided to end their relationship due to David's infidelity, and he had agreed to stay at his parent's house while mother moved her things out of their shared home. Mother had had a glass of wine with her dinner that night. The altercation occurred when David unexpectedly returned to the residence. Mother, upset that he had come back to the house, asked him to leave, and they began yelling at one another. According to mother, when she tried to push him out the front door, David grabbed her arms to restrain her, leaving bruises on her arms. The police (who had apparently been called by a neighbor) arrived as the two walked outside and continued to argue.

The child, who was five years old at the time, was in the living room with David and mother during the argument. Mother later testified that when David restrained her arms, he did it "basically in front of" the child.

The police arrested mother. When asked by the social worker who responded to the scene, mother said she did not know why she was arrested. She said that the police told her that they could smell alcohol on her breath and then handcuffed her.

2

Mother later testified that David had told the police that she "was the one who was assaulting him." Mother denied assaulting or throwing things at him, however, and when the social worker asked David whether the argument was physical, verbal, or both, he stated that it "was verbal and it was quick."

David also told the social worker that, on previous occasions, he and mother had had physical arguments where she had thrown things at him. He reported that the child was usually in another room during the arguments. Mother told the social worker that, a few days earlier, David had gotten angry and threw a toy at the television set, smashing the television. However, mother denied that the couple had had physical altercations in the past.

When the social worker arrived at the house on the night of the July incident, the child was asleep in bed. The social worker spoke with the child after she had awakened. When asked how she was feeling, the child said she was "happy." In response to the social worker's question about what had happened between mother and David that night, the child said, "I don't know."

Ultimately, after the July incident the district attorney declined to pursue a criminal case against mother and any charges were dropped.

### B.

### 1.

The dependency petition alleged, first, that mother had placed the child at substantial risk of suffering serious physical harm (see § 300, subd. (b)(1)(A)), because she "has engaged in at least one physical altercation with her boyfriend while in the presence of the child" and she "has a history of engaging in physical altercations with her romantic partners." Second, the petition alleged that mother was unable to provide regular care for the child due to her alcohol abuse, because she had consumed

alcohol prior to the altercation with her boyfriend, and she "has a history of alcohol usage that has led to previous Child and Family Services (CFS) involvement, including an incident in which the mother drove a vehicle while under the influence, with the child in the vehicle." (See § 300, subd. (b)(1)(D).) Third, the petition alleged that mother was unable to arrange care for the child when she was incarcerated on July 10, 2024. (See § 300, subd. (g).)

**2.**

At the detention hearing in July 2024, the court returned the child to mother's custody and ordered services for mother including drug and alcohol testing, substance abuse treatment, parent education classes, and domestic violence education. The court also ordered mother to abstain from alcohol and drugs, and the court ordered that there be no contact between the child and David.

**3.**

At a jurisdiction hearing in September, the only witnesses were a social worker and mother, both of whom testified on mother's behalf.

Andrew Jones was the social worker assigned to the case and had been in weekly contact with mother since mid-July, when the child was returned to mother's home. In his two months on the case, he had conducted a home visit and had "quite a bit of contact" with mother, and no concerning events had come up. During his conversations or visitations with mother, she had never appeared to be under the influence of alcohol or drugs. Jones had no concerns about mother's ability to protect the child, nor did he have any safety concerns for the child. Based on his meetings with mother and his review of the case, he had seen no "red flags" that would make him concerned about the child's safety.

4

Jones added that "if [mother] were to engage in another relationship with another individual," he would be concerned about her "ability to provide a safe space for her child." He explained, "There is some history in regards to Mom having some domestic violence incidents in the past. And Mom has taken protective measures to prevent this, but there is still some underlying concerns around that." When asked whether he thought mother had a "pattern" of domestic violence, Jones said, "I don't know if I would consider it a true pattern, but . . . it's definitely something to keep track of."

Jones also noted "some concerns around [mother's] history with alcohol consumption" because she had been previously arrested for "wet and reckless driving"; apparently referring to a 2022 conviction. "But . . . Mom has done a good job, to my understanding, of eliminating these concerns [about domestic violence and alcohol] for myself, and it appears to me that she is capable of providing [the child] with, you know, [a] protective, safe home at this time."

Jones noted that he had referred mother to domestic violence education classes because "it would definitely be beneficial." But he did not think it "should necessarily be mandatory, considering Mom has taken protective actions on more than one occasion in regards to getting a restraining order against . . . the father. And you know, making sure to separate herself from this most recent partner. . . . [S]he's shown that she can take . . . protective action for herself and her child."

Jones explained that mother had already completed an eight-hour domestic violence training in connection with her July arrest. He believed that she had insight into the domestic violence issues that she has experienced in the past. He had seen "growth" in his discussions with mother since he started working on the case, as he had "noticed that Mom is a bit more accountable for the situation that occurred in that . . . she wishes

5

that things didn't go the way they did in regards to her most recent partner" and "she understands there are things she needs to do to make sure that she can keep [the child] safe in her care."

Jones had also referred mother for an alcohol and substance abuse assessment, which she had not yet completed.

In mother's testimony, she asserted that she had complied with the court's order and had abstained from drinking alcohol. In the past, she had alcohol on special occasions, such as birthdays and holidays. She did not believe that she had a substance abuse problem with alcohol. She explained that she was willing to do the alcohol assessment if the court was requiring it, but she had not been able to complete the assessment yet; she had reached out to approximately seven agencies and she had not yet found an agency that would take her case because they only work with individuals who have a substance abuse problem.

With respect to her relationship with David, mother testified that she broke up with him because "[n]ot only was he cheating, but he was already showing signs of . . . narcissistic abuse. So I had to take every measure[] to end things immediately based on what I went through with my daughter's dad that I have an existing [restraining order] against."

Mother testified that she had gained a better understanding of domestic violence from the class that she took, and that she believed she had learned enough to avoid further domestic violence relationships. She explained: "I've learned about the cycle of abuse when it comes to being in a relationship and the red flags, and that . . . the cycle of abuse comes with . . . possessiveness, controlling [behavior], jealousy, [and] manipulation." She also learned "what to do in moments like that," including "how to take timeouts when there's a heated argument to avoid anything escalating or any blowouts between two individuals."

6

On cross-examination, mother testified that she felt that her parenting was "great" and "there's nothing that I'm putting my daughter in danger of. I have a nice home for her. I know all the signs of when it comes to what I went through with the domestic violence." When asked what she would have done differently in the July incident based on what she knew now, mother responded: "I don't know what I would have done differently because I feel like I did everything. I mean, . . . it was out of my control that he came there . . . . We agreed that he stay at his parents, and he came there unannounced, barging through the door." Asked why she did not call the police, mother explained that "there was no time for me to call the police" because "[i]t happened so fast." Mother acknowledged that "[m]aybe . . . I should have not had that leftover wine with my [dinner]," so that the police would not have smelled alcohol on her breath and "probably" would not have arrested her.

When asked what special occasion she was drinking for on the night of the July incident, mother asserted that there was some wine left over from David's mother's birthday celebration the night before. Later, under questioning by the dependency court, mother admitted that the birthday celebration was a week earlier, not the night before.[2]

---

[2] Mother also provided confusing testimony about prior law enforcement contacts involving allegations that she had driven while intoxicated. The dependency court indicated that it did not wish to rely on mother's testimony about the outcome of the prior contacts. According to the jurisdiction report, mother had a single 2022 conviction involving driving while under the influence of alcohol. Mother also had a 2021 child welfare contact that was found to be "substantiated," based on a police report that mother drove while under the influence of alcohol with the child. The Bureau's disposition report later explained that the 2021 matter was dismissed after the court found that mother "had a one-time lapse in her judgment."

On October 25, 2024, the trial court sustained the petition's first jurisdictional allegation based on failure to protect the child from domestic violence, and dismissed the remaining allegations. The court found that mother was no longer living with David; she had relocated to a different home; she was not in any relationship; and the social worker reported that the child was doing well and mother was not abusing alcohol or other substances during his home visits. The court stated, "I know that [mother] is a good mother. This is not about that. The question really is whether or not, in this particular time frame, when this petition was filed, . . . it was just several months ago -- whether or not, as of today's date, things still exist that would create a detriment, or a risk of detriment, to" the child. The court found that such detriment existed based on mother's lack of insight into the domestic violence she had been involved in, which the social worker had noted; the court found that there "is a lack of accountability and awareness to the role that [mother] play[s] in this situation." The court noted, "I actually think [mother] has done a significant amount. It is really just the insight that I think is important."

The court concluded that mother "has placed" the child at substantial risk of suffering "serious . . . emotional harm" and "potential physical harm" in that mother had engaged in one physical altercation with her boyfriend while the child was in the home and mother had a history of intimate partner violence with the child's father. The court added that the section 300, subdivision (b)(1)(A) allegation should be supported by a third factual allegation, "that at the time that mother was arrested for that [recent domestic violence] incident, she was under the influence of alcohol." The court found the section 300, subdivision (b)(1)(A) allegation "to be true with the amendments that [it] read into the record." The court continued the child in mother's custody with services.

8

**4.**

At the disposition hearing on June 18, 2025, the court determined that the child was a dependent child under section 300, subdivision (b), and continued her in mother's custody with family maintenance services. The court also denied motions by mother to dismiss the petition and transfer venue to San Francisco, where mother and child were then residing.

By the time of the disposition hearing, the child's father had appeared and the court had raised his status to that of presumed father. The court ordered services (domestic violence and parenting classes) to enhance visitation for father but declined to grant him visitation given that he had not yet obtained dissolution of the restraining order against him.

### DISCUSSION

Mother asserts that the dependency court's jurisdictional order was not supported by substantial evidence. We agree.

Section 300, subdivision (b)(1)(A), provides for dependency jurisdiction when a child "has suffered, or [when] there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" the parent's "failure or inability . . . to adequately supervise or protect the child." To establish jurisdiction, the question is whether the statutory criteria were met, by a preponderance of the evidence, based on the facts in existence at the time of the jurisdiction hearing. (See *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1318 (*Christopher M.*).)

Here, the court found that mother "has placed" the child at substantial risk of suffering "serious . . . emotional harm" and "potential physical harm" in that mother had engaged in one physical altercation with David while the child was in the home and mother had a history of intimate partner violence with father. The court's finding was legally and factually insufficient

9

to authorize jurisdiction under section 300, subdivision (b)(1)(A), however.

To begin, a substantial risk of suffering "serious . . . emotional harm" is not a basis for jurisdiction under section 300, subdivision (b)(1)(A). (See *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717-718 (*Daisy H.*), disapproved of on other grounds in *In re D.P.* (2023) 14 Cal.5th 266, 278.) Section 300, subdivision (b)(1)(A), authorizes jurisdiction based on a substantial risk of serious physical harm or illness, not mere "emotional harm." (See *Daisy H.,* at pp. 717-718.) And although section 300, subdivision (c) provides a separate ground of jurisdiction based on "serious emotional damage" in specified circumstances, the petition here did not allege, and the court did not find jurisdiction, on that ground. (See § 300, subd. (c) [providing for jurisdiction where "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care"].)

Similarly, the dependency court's finding of a risk of "potential physical harm" based on the July incident was insufficient to warrant jurisdiction under section 300, subdivision (b)(1)(A). The court made no finding that mother had placed the child at "*substantial* risk" of "*serious* physical harm," as required by the statute. (§ 300, subd. (b)(1)(A), italics added.)

Even if we assume the problem with the dependency court's finding was merely one of inartful phrasing, the record lacked sufficient evidence that the child was at substantial risk of serious physical harm. On the night of the incident, the child was in the living room when mother attempted to push David out the front door and he restrained her arms, but there was no evidence that anyone other than mother—who suffered bruising

10

on her arms—was physically harmed.  Although the Bureau points to the jurisdiction report's statement that "[i]t is alleged" that mother "hit and bit" David during the incident, the record contains no police report, witness statements, or testimony to support the allegation, and David maintained the argument was "verbal" rather than physical.  (See *In re Cole L.* (2021) 70 Cal.App.5th 591, 605 (*Cole L.*) [holding that social worker's second-hand summary of events did not constitute substantial evidence where it was contradicted by witness statements].)

The Bureau also relies on David's statement that, prior to the July incident, the couple had had arguments during which mother had thrown things at him.  The trial court made no finding, however, that mother had previously instigated any incidents of domestic violence that placed the child at substantial risk of serious physical injury or illness, and it is not our role to find facts in the first instance.  (See *Cole L.*, *supra*, 70 Cal.App.5th at p. 606 [refusing to affirm a juvenile court decision "based on a factual finding . . . not made by the juvenile court"].)

Moreover, the question is whether there was a substantial risk to the child of serious physical harm *at the time of the jurisdictional hearing*.  (See *Christopher M.*, supra, 228 Cal.App.4th at p. 1318; *Cole L.*, *supra*, 70 Cal.App.5th at p. 607.) Domestic violence between the child's parents or caregivers may support jurisdiction under section 300, subdivision (b), " 'only if there is evidence that the violence is ongoing or likely to continue.' " (*In re B.H.* (2024) 103 Cal.App.5th 469, 482 (*B.H.*), quoting *Daisy H.*, *supra*, 192 Cal.App.4th at p. 717.)

*Cole L.* is instructive.  The court determined that a single incident of pushing and grabbing between the parents while the children were asleep in another room was insufficient to establish dependency jurisdiction where the parents did not live together and had not been in contact for several months, the mother had sought a restraining order, and the children had been living

safely with the mother for months after being released to her. (*Cole L.*, *supra*, 70 Cal.App.5th at pp. 606-607.) Similarly, in *In re S.F.* (2023) 91 Cal.App.5th 696 (*S.F.*), the court found no evidence that violence was likely to continue where the parents had engaged in three prior incidents of domestic violence involving shoving and grabbing outside the children's presence, but the parents had ended their relationship and no longer lived together. (*Id*. at pp. 715-716; see also *B.H.*, *supra*, 103 Cal.App.5th at pp. 484-485 [holding that past domestic violence between mother and two other partners did not provide substantial evidence that mother was likely to fail to protect her children in the future where she had ended both relationships].)

On the other hand, even when the relationship has ended, continued contact between the two parties could pose a risk of ongoing violence justifying dependency jurisdiction. For example, *In re L.O.* (2021) 67 Cal.App.5th 227 (*L.O.*), held that dependency jurisdiction was justified because, although the parents had separated, the parents "were still involved in an acrimonious family law matter and had domestic violence issues during custody exchanges." (*Id*. at p. 240.)

A history of domestic violence and serious assaultive behavior by the parent in dependency proceedings may also pose a risk of continuing violence, as was the case in *In re L.B.* (2023) 88 Cal.App.5th 402, 416-417 (*L.B.*). In *L.B.*, the mother's significant history of domestic violence had involved choking and beatings by her boyfriend of eight years and an incident in which she assaulted her boyfriend with a knife; her boyfriend also had a gun in the house. (*Id*. at pp. 406-408.) Although the mother had stated that she did not plan to return to the boyfriend's home, the mother had repeatedly gone back to her boyfriend in the past to avoid homelessness, denied that the domestic violence had occurred, failed to maintain a restraining order against the boyfriend, and had recently been arrested for assaulting another

man with a baseball bat, causing a brain bleed in the victim. (*Id.* at pp. 406-409 & fn. 3., 416-417.) Under these circumstances, *L.B.* concluded that there was a substantial risk of serious physical harm or illness to the child under section 300, subdivision (b)(1). (*L.B.,* at pp. 416-417.)

The facts here are much closer to *Cole L.* and *S.F.* than *L.O.* or *L.B.* Our review of the record reveals no evidence of ongoing violence or evidence that any violence was likely to continue. Although mother participated in the July incident by attempting to push David out the door, she also took numerous steps to protect her child. As the dependency court acknowledged, mother had ended her relationship with David, she secured alternative housing and moved out of his home, and she was not in a romantic relationship. When mother and father's relationship turned violent, mother similarly acted to protect her child by obtaining a protective order against father. There was no evidence that mother had any ongoing contact with either father or the ex-boyfriend. Although we agree that mother's testimony that she did not know what she would have done differently in the July incident raised potential concerns about her lack of insight, that is not enough to support a substantial risk of physical harm to the child at the time of the hearing, particularly given mother was not presently in a romantic relationship, nor was there evidence that she planned to enter into one. (See *In re Ma.V.* (2021) 64 Cal.App.5th 11, 22-23 [concluding that there was no "current risk" of violence, although the mother had not yet engaged in services that would allow her to spot the "red flags" for domestic violence, where the mother had ended her relationship with her abuser and no longer resided with him, and she was not in any new romantic relationships].)

Indeed, the Bureau deemed the circumstances safe enough for the child to be returned to mother's care just five days after the incident. The child had been living safely with mother for

13

over three months, with no concerning developments, by the time of the jurisdictional ruling. The social worker, Jones, who was in regular contact with mother and had conducted a home visit after the child was returned, had no safety concerns for the child and no concerns about mother's ability to protect her. And, as the dependency court found, mother "is a good mother."

In sum, the record lacked substantial evidence that, at the time of the jurisdiction hearing, mother's inability to protect the child would place her at substantial risk of serious physical injury. Having determined that the dependency's court's jurisdictional finding was unsupported, it is unnecessary for us to address mother's challenges to the court's subsequent orders.

## DISPOSITION

The dependency court's jurisdiction and disposition orders are reversed. The court is directed to dismiss the dependency petition.

BURNS, J.

WE CONCUR:

JACKSON, P. J.
SIMONS, J.

*In re N.V. / Contra Costa County Children & Family Services Bureau v. L.V.*
(A173712)

14