Filed 1/19/22  In re M.C. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re M.C. et el., Persons Coming Under the Juvenile Court Law. | B311013 (Los Angeles County Super. Ct. No. 20CCJP01369ABC) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  R.M.,  Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephanie Jo Reagan, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

R.M. (mother) is the mother of three children who are dependents of the juvenile court: M.C. (born October 2008), M.S. (born May 2012), and P.S. (born December 2015).[1]  Mother appeals from an order of the juvenile court finding true supplemental allegations in a petition filed pursuant to Welfare and Institutions Code section 387 and removing the three children from her custody.[2]  Mother also challenges the juvenile court's order granting father sole legal custody of M.C.  We find no error and affirm the orders.

## FACTUAL AND PROCEDURAL HISTORY

**Prior history**

Mother had five referrals between 2010 and 2016.  In 2010, mother and father were involved in a violent incident, which was substantiated.  Mother had a criminal court case stemming from the incident, and a voluntary family maintenance plan (VFM) was recommended.  Mother refused to participate with the case plan and was noncompliant with services.

In January 2011, the Los Angeles County Department of Children and Family Services (DCFS) received an anonymous

---

[1]     M.C.'s father is Michael C. (father).  The father of M.S. and P.S. is Noel S.  The fathers are not parties to this appeal.

[2]     All further statutory references are to the Welfare and Institutions Code.

2

referral alleging that mother neglected and physically abused M.C. The allegation was deemed unfounded. In November 2012, DCFS received a referral of emotional abuse, which due to mother and the children's whereabouts being unknown and them being identified as homeless, was deemed inconclusive.

In 2013, DCFS investigated allegations of emotional abuse, general neglect, and sexual abuse as to M.C and M.S. The allegations were deemed inconclusive, as mother was uncooperative during the investigation.

In 2016, it was reported that mother and Noel S. had a physical altercation in which Noel S. was reportedly pepper sprayed. The resulting investigation was inconclusive.

**Referral and investigation in the present matter**

On February 14, 2020, M.S. (then seven years old) reported to school with markings on his face and legs. The same day the social worker arrived at M.S.'s school and observed fresh red markings under his eye on the right side of his face, a mark on top of his right leg as well as a dark, brown-colored mark that appeared to be an old bruise. There was another dark, brown-colored mark that appeared to be an old bruise on his right leg, two more dark, brown-colored marks that appeared to be old bruises and two fresh red marks on his left inner leg, marks on his outer left leg, marks on the left side of his stomach, and a mark on his left chest area. There was a dark, brown-colored mark that appeared to be an old burn on his stomach, and a fresh red mark on the upper left side of his chest.

In response to the social worker's question to M.S. about how he obtained the fresh red markings, he reported that the previous day his sister M.C. hit him with a cord because M.S. had shot his little brother P.S. with a toy nerf gun. M.S. reported that his mother told M.C. to get a cord, and she then started hitting him

3

with the cord. M.S. described the cord as black with a small white piece of paper on it. When the social worker asked M.S. if he is hit often by M.C., he reported that he is hit with brooms and cords. When asked how many times he has been hit, M.S. reported "18 times." When the social worker asked M.S. how he obtained the older markings, M.S. responded that he had been hit with a cord by mother a long time ago. The social worker asked M.S. how he is usually disciplined, and he reported that he is usually hit with an open hand on his shoulder. M.S. reported that he had not seen his father, Noel S., since last year on his birthday.

The same day the social worker visited M.C. (then 11 years old) at her school. M.C. appeared concerned, and when the social worker explained the reason for her visit, M.C. said her mother told her, "What goes on in our home stays in our home." M.C. then stared at the social worker and refused to speak further.

A Los Angeles police officer interviewed M.S. on the same day and heard much the same as what had been told to the social worker. A representative of the Los Angeles County Sheriff's Department took M.S. into protective custody and took photographs of the child before releasing him to DCFS. Detective Liliana Becerra of the Special Victims Bureau opined that the fact that the markings were "downward" strikes indicated that M.S.'s injuries were not accidental. Detective Beccera reported that M.C. stated, "I didn't [whip M.S.] and if you wanna know what happened you're gonna have to talk to my momma." Detective Beccera believed M.C. was protecting her mother.

The social worker went to mother's home where mother stated that she was in the living room helping P.S. with his homework when she heard screaming. Mother got up to see what was going on. M.S. reported that M.C. had hit him with an extension cord. M.C. reported that it was an accident, although

4

M.S. insisted that she did it on purpose. Mother reported that M.S. showed her the mark on his face and one of his legs, but she was not aware of any other marks caused by M.C. After observing the photographs of M.S., mother denied physically abusing the child and denied that M.C. was the disciplinarian for the child. Mother admitted that the dark brown marks on M.S.'s inner right and left leg might have come from her disciplining him with a belt last year. Mother stated that her method of disciplining the child was taking away their phones or TV, making the children stand in the corner or "hitting them with an open hand on the butt or hand." Mother agreed to allow M.S. to be seen at health services that evening. Mother denied any mental health issues for her or the children, and denied any violence in the home. Mother denied having contact information for father or Noel S.

The social worker then met again with M.C., who was willing to speak with the social worker in the living room with mother present. M.C. reported that she had been playing with an extension cord, "swinging it around like a cowboy." The child reported that she hit M.S. by accident. When the social worker asked if mother told her to get the extension cord, M.C. reported that she did not remember. M.C. denied any violence in the home and reported that she had last spoken with father in 2018. Both M.S. and M.C. confirmed that they had been hit by mother with a belt as a form of discipline.

The social worker heard that evening from a nurse that mother arrived for M.S.'s examination but refused to speak to the nurse practitioner and refused to allow M.S. to be seen alone. The nurse practitioner was not allowed to take any photographs and was only able to observe the markings on the child. Mother informed the nurse that she did not have time for this and that she would not come back. The nurse practitioner opined that the marks

she observed on M.S. were consistent with physical abuse, and that she did not "believe that the marks and bruises [were] consistent with the family's story of the sibling [M.C.] hitting the child as she does not believe that the marks could be made with a child's strength of [M.C.'s] stature." The social worker left mother a message indicating that it was imperative that M.S. be seen for medical care for his injuries. The social worker did not get a response from mother.

After completing the investigation the social worker concluded that the children were at very high risk for future abuse and neglect.

## Section 300 petition and detention

On March 9, 2020, DCFS filed a dependency petition pursuant to section 300 alleging that all three children were described by section 300, subdivisions (a), (b), and (j). The court ordered the children detained from mother and their respective fathers, and they were placed with relative caregivers.

In April 2020, DCFS filed a jurisdiction/disposition report. In an interview M.C. informed the social worker that mother had instructed her to hit M.S., stating, "my mom instructed me to get the belt and she told me to hit him." When the social worker asked M.C. if mother had forced her to hit her brother, M.C. responded, "no she didn't force me. She instructed me and I listened to my mom."

M.S. was also interviewed. As to the allegations M.S. stated, "my mom told [M.C] to get the belt but she got the cable and started to hit me." M.S. stated that M.C. "trapped" him in his room and would not stop, even after mother instructed her to stop. M.S. recounted other occasions when he was hit by mother. P.S., then age 4, reported that "[t]hey whoop [M.S.] with [a] belt." The social

worker attempted to get a clear answer from P.S. as to who he meant when he said "they," but was not successful.

Father, in a telephone interview, insisted that M.C. would never have hit M.S., stating, "[M.C.] is the nicest girl. She wouldn't have done that. It would have been an adult in the home." Father stated that M.C. was "always really quiet" and that he never observed any marks or bruises on her. Noel S. stated that he never saw mother hit any of the kids, offering, "She was probably stressed."

A detective reported that two misdemeanor charges had been filed against mother, who was scheduled to be arraigned sometime in July 2020.

Mother provided the social worker with a certificate of enrollment for an anger management course. Mother's anger management counselor confirmed mother successfully completed that course and a parenting course. Though mother claimed she was enrolled in individual counseling, she had not provided proof of such enrollment.

**Jurisdiction/disposition**

At the July 2020 adjudication on the section 300 petition, father was found nonoffending, but the petition was sustained as to all three children based on the allegations regarding mother. Counts a-1, b-1, and j-1 alleged that mother created a detrimental and endangering home environment for the children when she instructed M.C. to physically discipline M.S. with an extension cord. Counts a-2, b-2, and j-2 alleged that mother physically abused M.S. by striking him with an extension cord and a belt on prior occasions, leaving dark brown marks on his body.

The juvenile court held the disposition hearing in August 2020. The court took into evidence the sustained petition and DCFS's reports. The court also received a letter of completion and

7

certificate dated June 2020 indicating mother completed a 15-week parenting program and had demonstrated a good understanding of the program.

Mother testified that she had learned from the parenting program and anger management courses she had taken. Mother also accepted responsibility for instructing M.C. to hit M.S. She acknowledged that she had hit M.S. in the past with a belt, but denied that it caused any bruising.

DCFS argued that the children should be removed from mother, who had only recently accepted responsibility for her actions, and was not enrolled in individual counseling, which DCFS believed was necessary to prevent future abuse.

Mother's counsel argued that the children should be returned to mother with a family preservation referral. Counsel for the children also argued that the children could safely be released to mother with services in place.

The juvenile court declared the children to be dependents, but found that services were available to prevent removal. The court found release of the children to mother with services would not be detrimental to the children. The court ordered M.C. released to mother and father, and M.S. and P.S. released to mother and removed from Noel S. The court ordered the children placed in mother's home under the supervision of DCFS. The court ordered DCFS to provide family maintenance services to mother and father, and bypassed services to Noel S.

Mother was ordered to attend and complete a DCFS-approved parent education program, conjoint counseling with the children if recommended by the children's therapists, and individual counseling with a licensed therapist to address case issues. P.S. was to be referred for an individualized education plan (IEP).

Mother's case plan also required family preservation services, and the court advised mother to cooperate with the social workers.

**Removal application and order**

Less than a week after the disposition hearing, M.S.'s assigned therapist contacted DCFS for assistance in trying to reach mother to schedule an appointment. Mother indicated she did not want services initiated at that time. The social worker visited the children on August 26, 2020, at the maternal grandmother's home. When the social worker asked to speak to mother, maternal grandmother stated that mother was on the phone and that the social worker should speak to mother's lawyer. Mother did not respond to a text message from the social worker the following day.

On August 27, 2020, the social worker went to mother's home and met with mother and the children. Mother agreed to receive services to assist her in obtaining beds for the children. When the social worker asked mother why she had not responded to the text, mother said her children often play with her phone. She denied seeing the text.

On September 2, 2020, the social worker received an e-mail from Harbor Regional Center that mother refused to allow them to e-mail her an application or consent forms for services. On September 8, 2020, the social worker called mother and left her a voice mail message to schedule a home visit. Mother did not respond.

On September 11, 2020, M.C.'s assigned therapist attempted to contact mother to conduct an initial assessment, but mother did not answer her phone. The therapist left a message. Mother later reported to the social worker that M.C. did not want to participate in therapy.

On September 15, 2020, the social worker scheduled a home visit with mother for September 16, 2020. Mother allowed the social worker in the home, and they discussed P.S.'s proposed IEP.

The social worker was also able to complete a home visit on September 18, 2020, at which time she observed the three children. Mother reiterated that M.C. did not want to participate in therapy. When the social worker asked M.C. why, she just shook her head. Another visit to the children was successfully carried out on September 25, 2020.

On October 6, 2020, the social worker went to the home to conduct an unannounced visit. Mother would not allow the social worker inside because he came without scheduling an appointment. The social worker explained that it was an unannounced visit, but mother would not allow him in the home or allow him to speak to the children.

The same day the social worker received an e-mail from a psychologist with the Department of Mental Health who reported that she had been unsuccessfully trying to schedule an assessment for P.S. The psychologist asked for the social worker's assistance in conveying the importance of scheduling the assessment to mother.

On October 13, 2020, the social worker sent mother a text asking if he could schedule an appointment to come and visit the children to which he received no response. Two days later mother texted the social worker to let him know that P.S. was chronically ill, and she did not want people around him. In response to the social worker's question to mother if she had taken P.S. to the doctor, mother said she did not consent to the social worker receiving P.S.'s medical or educational information.

On October 20, 2020, the social worker texted mother about going to the family home to see the children. Mother replied that she would be consulting with her attorney about whether the visits

10

could be conducted via Zoom or WebEx.  The same day the family preservation worker called the social worker to report that mother stated she was not ordered to participate in family preservation and preferred visits to be via Zoom or WebEx.

On October 28, 2020, DCFS filed an order seeking to remove the children from mother, which was signed by the juvenile court.

The children were removed from mother on October 30, 2020. M.C was placed with father, and M.S. and P.S. were placed with maternal grandmother.

**Supplemental petition and report**

On November 3, 2020, DCFS filed a supplemental petition pursuant to section 387.[3]  The petition alleged that the previous disposition was not effective in protecting the children because mother refused to comply with the juvenile court's order for individual counseling and family preservation services and failed to allow DCFS access to the children.  The juvenile court agreed that although mother had partially complied with court orders, mother had not enrolled in individual counseling, family preservation, or services for the children, and was not permitting DCFS monthly face-to-face contact with the children.  The juvenile court ordered the children detained.

DCFS prepared a report in anticipation of the February 2021 adjudication and disposition of the supplemental petition.  M.C. was happy living at father's home.  Father reported that mother was difficult to deal with and that M.C. seemed "secretive."  M.C. denied there were any issues in mother's home and denied that mother

---

[3]     Section 387 permits DCFS to seek an order "changing or modifying a previous order by removing a child from the physical custody of a parent" after a noticed hearing based upon a supplemental petition.

11

ever hit her. M.C. reported that in October 2020, P.S. went to the doctor and was given a breathing machine. M.C. did not know why mother would not allow the social worker to visit them in October 2020.

M.S. denied that mother physically abused him or that anyone had hit him. He denied that anyone said anything to make him feel uncomfortable. P.S. also denied being hit by mother.

During an interview with a maternal uncle, he reported that the children were wearing the same clothes they had been wearing since before the placement because mother refused to provide additional clothing for them. The social worker informed maternal uncle that he would process a clothing allowance for the children. The maternal uncle expressed concern that mother would not comply with the court's orders.

The social worker attempted to contact mother to interview her on November 13, 2020. Despite leaving a message asking for a return call, none came. The social worker tried to reach mother again on November 25, 2020, and again left a message asking for a return call. The social worker also sent mother a text message on the same date. The social worker tried to reach mother again on December 2, 2020, but mother's phone was not receiving calls. The social worker sent mother a text message, but she did not respond. Mother responded only to a text message about setting up a visitation schedule.

The Casey Foundation, which had provided mother with a food voucher and could provide rental and utility assistance, reported that mother's compliance was very low. The Casey Foundation was planning to close mother's services on December 12, 2020.

As of January 13, 2021, mother still had not contacted DCFS to provide a statement for the report. Due to mother's

noncompliance, DCFS reported that the risk to the children was very high. DCFS recommended that mother be provided with reunification services for M.S. and P.S., and that the case be closed as to M.C. with a juvenile custody order granting father sole physical custody of M.C. and shared legal custody between mother and father, with monitored visits for mother.

**Adjudication and disposition of the supplemental petition**

The adjudication of the supplemental petition was held on February 5, 2021. The juvenile court received DCFS's reports into evidence as well as a parenting certificate for mother dated June 16, 2020, an anger management certificate and letter dated July 16, 2020, a counseling document signed October 23 and 27, 2020, and an L.A. Cares program notice dated October 29, 2020.

### *The social worker's testimony*

The social worker testified that he had been working with the family since May 2020, and he had provided mother with a copy of the court's disposition minutes and referrals tailored to her case plan. Mother was assigned to participate in family preservation with Dignity House, but refused to participate in the program. Mother would not allow the family preservation social worker into her home to conduct an assessment or interviews. The social worker referred mother to the Casey Foundation to assist with services, but mother did not enroll in the programs. Mother never provided documentation that the children were following up with therapy or regional center services.

Mother allowed the social worker into her home to speak with the children twice in August 2020 and twice in September 2020. However, mother would not allow the social worker into her home in October 2020, despite several requests. Mother inquired if the visits could be conducted via Zoom or WebEx, but the social worker responded that he was required to see the children face-to-face. The

13

social worker made a total of about eight to 10 attempts to see the children in person, but mother refused. Since the time that the detention petition was filed, mother had not provided the social worker any documentation that she was enrolled in services and had not responded to the social worker's calls. The social worker acknowledged that during the visits that he was able to complete, he did not see anything concerning or anything that presented a risk to the children.

### *Mother's testimony*

Mother acknowledged receiving referrals from the social worker, but when she followed up on the referrals they either had waiting lists or provided the wrong services. Mother stated that she informed the social worker of this but did not receive any additional referrals. Mother acknowledged that around the beginning of October there was an occasion when she did not allow the social worker into the home. She informed the social worker that she and her family were not feeling well and asked if the visit could be done by Zoom or WebEx. Mother denied that the social worker ever returned to her home. Mother also acknowledged receiving a call from family preservation services and inquired if such services could be provided via Zoom or conference call. Mother explained that the family was sick, and she did not feel it was in her children's best interest to allow people into the home.

Mother testified that she was enrolled in individual counseling through Compton Mental Health. She enrolled in the program in January 2021 and had an upcoming appointment. Mother admitted she never informed the social worker that she had enrolled at Compton Mental Health. Mother testified that she maintained communication with the social worker and offered to meet with him, but he did not respond to her. Mother believed the social worker did not give her the opportunity to enroll in services.

14

### *Trial court ruling*

On February 10, 2021, the court issued its ruling, finding that the social worker "tried everything to get the mother to cooperate and comply. The mother wouldn't enroll in programs, stopped allowing the unannounced home visits, and became uncooperative. And he gave her specific referrals to programs." As to mother's concerns for the health of her children, the court stated, "at this point, the children were placed [in the] home of mother under the supervision of [DCFS] with a plan in place, with a safety net to ensure their safety, and that safety net has not been successful."

The court found the supplemental petition true by a preponderance of the evidence.

### *Disposition*

For the dispositional phase, the court considered the same evidence it considered for the adjudication, plus the stipulated testimony of M.C. that she was willing to return to mother.

DCFS recommended that jurisdiction be terminated as to M.C. with a juvenile court order granting father sole physical custody, with joint legal custody to father and mother. Father's counsel agreed, but asked that father be granted sole physical and legal custody. M.C.'s counsel submitted on DCFS's recommendations but advised the court that M.C.'s main concern was her wish to have visitation with mother.

As to M.S. and P.S., DCFS recommended that they be removed from mother with family reunification services offered to mother. M.S.'s and P.S.'s counsel joined in DCFS's recommendation.

The court found by clear and convincing evidence that the previous case plan had not been successful in ensuring the children's safety. The court found by clear and convincing evidence that remaining in mother's care would provide a substantial danger

15

and risk of detriment to the children's physical health, safety, protection, or physical or emotional wellbeing. The court removed the children from mother's custody.

M.S. and P.S. were ordered to be suitably placed, and granted mother monitored visitation and reunification services.

The court placed M.C. with father and terminated jurisdiction with a juvenile custody order granting father sole legal and physical custody and granting mother monitored visitation.

### *Notice of appeal*

On March 1, 2021, mother filed her notice of appeal.


## DISCUSSION

Mother contends that substantial evidence did not support the juvenile court's decision to sustain the allegations in the supplemental petition. She further argues that the dispositional order removing the children from her custody is unsupported by substantial evidence. Finally, mother contends that the trial court erred in ordering sole legal custody of M.C. to father because mother was given no prior notice that such an order was under consideration, and it was not supported by substantial evidence.

We address each of mother's contentions separately below. We find that substantial evidence supported the juvenile court's findings sustaining the allegations in the supplemental petition and removing the children from mother's care. We further find no error in the juvenile court's decision granting father sole legal custody. Therefore, affirm the orders.

## I. The supplemental petition

### A. *Applicable law and standard of review*

Section 387 provides that an order changing or modifying a previous order by removing a child from the physical custody of a parent shall be made only after noticed hearing upon a

16

supplemental petition.  The supplemental petition must contain "a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child."  (§ 387, subd. (b).)

The hearing on a supplemental petition is bifurcated.  (*In re D.D.* (2019) 32 Cal.App.5th 985, 990 (*D.D.*).)  First, the juvenile court conducts an adjudication hearing in which it must find by a preponderance of the evidence whether or not the facts alleged in the supplemental petition are true.  (*Ibid.*)  At the adjudication hearing, "the sole issue is whether the allegations in the supplemental petition are true that the previous disposition order has been ineffective in the protection or rehabilitation of the child."  (*Ibid.*)

If it finds that the allegations in the supplemental petition are true, the court must then conduct a dispositional hearing to determine whether there is a need to remove the child from the parent.  At the dispositional hearing, the clear and convincing standard for removal from parental custody under section 361, subdivision (c)(1) applies.  (*D.D., supra*, 32 Cal.App.5th at p. 990.)

"'We review an order sustaining a section 387 petition for substantial evidence.'"  (*D.D., supra*, 32 Cal.App.5th at p. 990.)  Substantial evidence must be reasonable, credible, and of solid value.  (*Ibid.*)  "'We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order and affirm the order even if other evidence supports a contrary finding.'"  (*Ibid.*)

"Mother, as appellant, bears the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order."  (*D.D., supra*, 32 Cal.App.5th at p. 990.)

17

**B.** *Substantial evidence supported the juvenile court's determination that the previous disposition had not been effective in protecting the children*

Substantial evidence in the record supports the juvenile court's determination that the previous disposition order was ineffective in protecting the children. The children were dependents of the court due to allegations of physical abuse that were found true by the juvenile court. Specifically, M.S. was struck by M.C. with an extension cord, leading M.S. to sustain scratches, bruising, red marks to his legs, arms, chest, and underneath his eye. The child also had old marks on his legs and forearms, arms, sides, legs, and chest. In addition to the abuse by M.C., at the instruction of mother, the juvenile court found true allegations that mother had previously physically abused M.S. by striking the child with her hands, a belt and an extension cord. However, the juvenile court found that services were available to prevent the children's removal from mother, and that in light of the available services, release of the children to mother would not be detrimental to them.

The initial disposition order placed the children in the home of mother under the supervision of DCFS. DCFS was to provide family maintenance and family preservation services. In addition, the court ordered parenting education, conjoint counseling with the children if recommended by their therapists, and individual counseling to address case issues. The court specified that mother's individual counseling was to be with a licensed therapist and should address case issues, "including appropriate discipline." The children were also all ordered to participate in individual counseling, and P.S. was to be referred for an IEP. The court warned mother, "Cooperate with the social workers. Social workers

for the parents are the ones who are going to be writing the reports with the recommendations to the court."

Mother refused to participate in individual counseling and did not respond to the children's assigned therapists who attempted to set up appointments with the children. Mother refused to sign consent forms for the regional center to evaluate P.S., and indicated to the family preservation service that such services were not required. And although mother permitted the social worker access to the children in the months of August and September 2020, on October 6, 2020, when the social worker tried to see the children in person, mother refused the social worker access. It is unknown what the social worker would have observed on that day or what the children would have reported.

Mother denied the social worker access to the children not just on that one occasion, but for a period of three weeks. Starting on October 13, 2020, the social worker began making additional efforts to visit the children, and to reach mother to schedule a visit. The social worker reported that he made eight to 10 attempts to contact mother. On October 28, 2020, the social worker had no choice but to seek court intervention and secure a removal order due to mother's failure to cooperate. Although mother claimed that the children were ill, she did not report that she took them to a doctor or consulted with a doctor. Instead, she indicated that she did not consent to the social worker receiving the children's medical information.

Mother's reasons for denying the social worker access to the children during October 2020 varied. Initially, she complained that she was not given advance notice, although the social worker explained that it was an unannounced visit. A week later, she stated that she was denying access because P.S. had a chronic illness. At trial, when it was pointed out that P.S.'s purported

19

chronic illness had not prevented previous in-person visits, mother stated that both she and P.S. were sick. In other testimony, she claimed that all three children were sick. The juvenile court was not required to credit mother's contradictory evidence.

The evidence described above constitutes substantial evidence supporting the juvenile court's determination that the previous disposition order was ineffective. The children had been released to mother on the condition that DCFS supervise the family and provide services. In addition, mother was required to participate in services and to enroll her children in appropriate services. Mother had not cooperated and had denied the social worker access to the children. Mother's failure to cooperate interfered with the court's ability to ensure the children's safety and wellbeing. The juvenile court's order finding the allegations true in the supplemental petition were well supported and warranted under the circumstances. (§ 362, subd. (c).)[4]

Mother's main argument appears to be that there were no facts in the supplemental petition demonstrating that the children were at risk of harm. Mother claims that failure to complete counseling and programs alone are insufficient to establish a risk of harm to the children. Mother cites several cases which hold that in the absence of risk of harm at the time of the hearing, a petition cannot be sustained. However, the cases mother cites all involve initial petitions pursuant to section 300. (*In re Israel T.* (2018) 30

---

[4]     Section 362, subdivision (c) states: "If a child is adjudged a dependent child of the court, on the ground that the child is a person described by Section 300, and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, the parents or guardians shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court."

Cal.App.5th 47, 51; *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1318; *In re Carlos T.* (2009) 174 Cal.App.4th 795, 803; *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) Thus, the cases are irrelevant. A supplemental petition pursuant to section 387, such as the one mother challenges here, does not need to allege new jurisdictional facts or additional grounds for dependency. Instead, the supplemental petition need only demonstrate that the previous disposition has not been effective in protecting the children. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161; *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1200; *In re John V.* (1992) 5 Cal.App.4th 1201, 1211.)

Due to mother's failure to cooperate with DCFS and participate in the court-ordered programs, the condition of the children during the time that the social worker was unable to access the children is unknown. While mother insists that there was no evidence that they were harmed during this period of time, she blocked DCFS, therapists, and family preservation workers from seeing the children. A condition of the release of the children to mother was intervention and the ability to speak with the children privately. Mother refused to cooperate. Thus the juvenile court appropriately sustained the allegations in the section 387 petition.

## II. The disposition order

Mother argues that even if this court finds substantial evidence supporting the juvenile court's decision to sustain the supplemental petition, the dispositional order removing the children from mother's care is unsupported by substantial evidence, especially considering the clear and convincing standard of proof.

### A. *Applicable law and standard of review*

"'When a section 387 petition seeks to remove a minor from parental custody, the court applies the procedures and protections of section 361.'" (*D.D., supra*, 32 Cal.App.5th at p. 996.) "Before

21

removing a minor from his or her parent's custody, the court must find, by clear and convincing evidence, that '[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody.'" (*Ibid.*, quoting § 361, subd. (c)(1).) "It is not required that the parent be dangerous or that the child have been harmed before removal is appropriate." (*D.D.*, at p. 996.) "'The focus of the statute is on averting harm to the child.'" (*Ibid.*)

The juvenile court's finding that removal is necessary is reviewed for substantial evidence. (*D.D., supra*, 32 Cal.App.5th at p. 996.) When reviewing a finding made pursuant to the clear and convincing standard of proof, we must determine "whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) Given that "[a] dispositional determination that [a child] should be removed from her parents' custody requires a greater degree of proof," the proof required to support a finding that a child is a dependent child may not support a dispositional order removing the child from parental custody. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 148.)

**B.** ***Clear and convincing evidence supported the juvenile court's dispositional order removing the children from mother's custody***

The record contains clear and convincing evidence that the children had been physically abused by mother and at mother's direction. The evidence came from photographs of M.S.'s injuries and other marks on his body, statements from M.S. and M.C., and

mother's own admissions.  The court attempted to craft a dispositional order that would protect the children while allowing them to remain with mother.  Substantial evidence supported the juvenile court's finding that the previous disposition order was ineffective in protecting the children from potential physical abuse.  As the juvenile court explained, "the services were put into place to prevent the reoccurrence of inappropriate physical discipline, and without those services in place, or at least rather without mother complying with them, that risk remains."

As set forth above, mother refused to participate in individual counseling and defied the juvenile court's order that the children be placed in therapy.  In October 2020, mother refused the social worker's efforts to visit with the children to ensure their safety.  She also refused services from the regional center and the family preservation organization.  Mother further ignored the social worker's efforts to contact her in November and December 2020 for the purpose of obtaining mother's statements for the section 387 disposition report.  These facts supported the juvenile court's decision that removal was necessary in order to protect the children.  Given the original finding of substantial risk to the children, mother's disregard of the court orders put the children at greater risk and demonstrated that there were no reasonable means to protect the children without removal.  Mother's previous abuse of the children, and her refusal to cooperate with the court's prior dispositional order, constitute clear and convincing evidence supporting the juvenile court's decision to remove the children from mother's custody.

## III.    The order granting sole legal custody of M.C. to father

At the time of disposition on the supplemental petition, DCFS recommended that jurisdiction be terminated as to M.C. with a juvenile court order granting father sole physical custody, with joint

23

legal custody to father and mother.[5]  Father's counsel agreed, but argued that father should be granted sole legal custody.  The juvenile court terminated jurisdiction over M.C. with an order granting the father sole physical and legal custody.  Mother's counsel entered an objection as to the legal custody decision, which was overruled.

On appeal mother argues that she was not given prior notice that an order of sole legal custody to father was under consideration.

### A.    *Applicable law and standard of review*

"When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court." (*In re Roger S.* (1992) 4 Cal.App.4th 25, 30.)  This court generally reviews the custody orders under an abuse of discretion standard.  (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

However, since mother argues that she was denied due process of law because she was not given notice that the juvenile court was considering an order of sole legal custody to father, the question of whether an appellant was given constitutionally required notice is a legal one, reviewed de novo.  (*Severson & Werson, P.C. v. Sepehry-Fard* (2019) 37 Cal.App.5th 938, 944.)

---

[5]    DCFS has filed a partial no-position letter in this matter, indicating that because DCFS did not seek an order of sole legal custody to father, it is presently taking no position on mother's appeal of this issue.  DCFS contacted the trial counsel that represented father below and informed him that DCFS will not be defending the order granting the father sole legal custody.  Father has not filed a respondent's brief addressing this issue.

Procedural due process focuses on the "fundamental elements of fairness of a procedure which would deprive the individual of important rights." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 412 (*Crystal*).) Parenting is "a fundamental right the impairment of which requires strict adherence to procedural due process." (*Ibid.*)

"Due process requirements in the context of child dependency litigation have . . . focused principally on the right to a hearing and the right to notice." (*Crystal, supra*, 12 Cal.App.4th at pp. 412-413.) "A meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses, and hence a failure to provide parents with a copy of the social worker's report, upon which the court will rely in coming to a decision, is a denial of due process." (*Id.* at p. 413.) However, where a report is prepared and is available to the parties prior to a noticed hearing, "errors or omissions in the report cannot be characterized in terms of denial of due process." (*Ibid.*)

In *Crystal*, the assessment reports submitted by the agency failed in some respects to comply with the level of detail specified in section 366.21, subdivision (i)—specifically, the subsection which required a report of criminal records or abuse referrals as to the adoptive parents and an assessment of the financial stability of the adoptive parents. (*Crystal, supra*, 12 Cal.App.4th at p. 413.) Mother contended that the deficiencies in the assessment reports constituted a violation of procedural due process. (*Id.* at p. 412.) While the *Crystal* court agreed that the assessment reports failed in some respects, the deficiencies did not amount to a deprivation of procedural due process. (*Id.* at p. 413.)

**B.** *Lack of notice of the legal custody issue did not amount to a deprivation of procedural due process*

Mother insists that she did not know that legal custody would be an issue at the dispositional hearing on the supplemental petition. Thus, mother claims, neither she nor her counsel knew

25

that they should be prepared to present evidence of mother's actions over the years to ensure M.C. was enrolled in school, attended medical appointments, and competently carried out other actions concerning the exercise of legal custody.

However, mother does not deny that she had notice of DCFS's intention to terminate jurisdiction with an order that M.C. should be placed in father's physical custody. While DCFS recommended that the parents be granted joint legal custody, mother was nevertheless forewarned that the question of legal custody would be at issue at the hearing.

*In re Stacy T.* (1997) 52 Cal.App.4th 1415 is distinguishable. In *Stacy*, contrary to the local rules, the mother was not advised at the detention hearing that a failure to appear at the settlement conference would result in her default. (*Id.* at p. 1424.) After the mother failed to appear at the settlement conference, the court entered her default, and proceeded immediately to the jurisdictional and dispositional hearings. (*Ibid.*) Thus, the mother missed her opportunity to confront and cross-examine witnesses and to present her own evidence. The mother was caught in a "catch-22 of the local settlement conference-default scheme," and was deprived of her fundamental right to adequate notice and the opportunity to be heard. (*Ibid.*) *Stacy* does not suggest that mother was deprived of a fundamental right to notice in the matter before us.

Mother points out that prior to a review hearing pursuant to section 364, DCFS had an obligation to provide notice of the hearing to the parents. (§ 292, subd. (a)(1).) Such notice must include "a statement regarding the nature of the hearing to be held and any change in the custody or status of the child being recommended by the supervising agency." (§ 292, subd. (d).) DCFS complied with this statute by providing mother with proper notice and including its recommendation that jurisdiction be terminated as to M.C. with

an order granting father physical custody and granting the parents joint legal custody. The juvenile court did not follow DCFS's recommendation on the issue of legal custody. However, this does not amount to a violation of procedural due process.

Mother contends that there was no evidentiary basis for the order granting father sole legal custody. There was however ample evidence that mother was noncompliant with services and uncooperative both with DCFS and with father. Father's counsel pointed out that "mother had an opportunity to comply with services and resolve the issues, and mother chose not to." At the same time, father had "remained in compliance, remained in communication with [DCFS]," and showed he was "able to adequately and safely parent and protect [M.C.]." At the same time that father's counsel sought full legal custody, counsel also requested that "all exchanges for visitation time occur at the La Puente Sheriff's Station." The request highlights father's previous testimony to DCFS that mother was "difficult to deal with." Such evidence is sufficient to support the juvenile court's order regarding legal custody of M.C.

No abuse of discretion occurred, and mother was not deprived of procedural due process.

## DISPOSITION

The orders are affirmed.

_____
CHAVEZ, J.

We concur:

_____          _____
LUI, P. J.                                    ASHMANN-GERST, J.

27