Filed 9/22/22  In re A.W. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re A.W., a Person Coming Under the Juvenile Court Law. | B311541<br>(Los Angeles County<br> Super. Ct. No. 20CCJP04547) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LAVONTE W.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa Brackelmanns, Judge.  Affirmed.

Vincent Uberti, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Jane E. Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

Lavonte W., the presumed father (father) of A.W., appeals from the juvenile court's jurisdictional findings and disposition order removing A.W. (born Jan. 2015) from his custody. Despite the continuing presence of jurisdiction over A.W. based on the conduct of Asia P. (mother, who is not a party to this appeal), father challenges the sufficiency of the evidence supporting the court's jurisdictional findings that his current incarceration, criminal history, and dangerous behavior placed A.W. at a substantial risk of serious injury warranting removal from his custody. We reject these contentions and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Around July 2020, A.W. was living with mother, mother's boyfriend (E.A.), and A.W.'s younger half-siblings (A.A. and A.A.-P.; born June 2017 and Aug. 2018, respectively).[1] Throughout the entirety of this case, father was serving a 22-year prison sentence for voluntary manslaughter. Father had been incarcerated since December 2015.

To visit with A.W. on July 27, 2020, paternal aunt (Lariyha G.) picked up A.W. from mother's home. While in the car with A.W., Lariyha G. noticed a laceration to A.W.'s ear. When Lariyha G. asked what happened, A.W. told Lariyha G. that E.A. had grabbed and twisted her ear during an argument E.A. was having with mother. Lariyha G. took A.W. to the police station, and the Los Angeles

---

[1]    E.A. is the father of A.A. and A.A.-P. E.A., A.A., and A.A.-P. are named in the operative petition but are not subjects of this appeal.

Department of Children and Family Services (DCFS) received a referral for emotional and physical abuse the next day.

A social worker interviewed mother and A.W. on August 11, 2020. Mother reported that she had allowed E.A. to visit with A.W. and her half-siblings even after mother ended her relationship with E.A. in March 2020. Following the July 27, 2020 incident, however, mother prohibited E.A. from having any contact with A.W. or her half-siblings. A.W. confirmed that E.A. had twisted her ear on July 27, 2020. During the same incident, A.W. reported that E.A. scratched her leg and pinched her forehead. Regarding mother's care, A.W. reported that mother had cared for her alone after smoking something A.W. described as smelling like "dead cat."[2] A.W. did not know the identity of her biological father.

In an August 18, 2020 telephonic interview, E.A. denied that he had injured A.W. the prior month. E.A. also reported that mother's housing situation was unstable, that mother used marijuana in A.W.'s presence, and that mother left A.W. and her half-siblings in his care with "rashes, scratches[,] and marks on their bodies."

A social worker conducted a California Law Enforcement Telecommunications System (CLETS) search for father. The search revealed that father had a January 2014 conviction for battery of a current or former spouse (Pen. Code, § 243, subd. (e)(1)), and was

---

[2]    A.W. was too young to understand the concept of drugs. Mother denied using marijuana in the presence of children.

3

serving a 22-year prison sentence for a December 2015 conviction for voluntary manslaughter (*id.*, § 192, subd. (a)).

DCFS identified four prior referrals involving A.W.  In one substantiated referral in April 2019, mother left A.W. (then four years old) and her half-siblings inside a car unsupervised for 45 minutes.  The referral resulted in a voluntary family maintenance case.  The other referrals, each deemed inconclusive, alleged that mother had failed to adequately supervise A.W. and her half-siblings, and had engaged in violent altercations with E.A. in the children's presence.  During DCFS's initial investigation in this case, mother failed to take A.W. and her half-siblings to a HUB examination, and instead left the state with A.W. without informing DCFS of her or A.W.'s whereabouts.[3]

On August 31, 2020, DCFS filed a Welfare and Institutions Code section 300 petition alleging that A.W. was at risk of serious harm due to E.A.'s physical abuse, mother's failure to protect, and father's history of criminal convictions and incarceration.[4]  (See § 300, subds. (a), (b)(1).)  The court detained A.W. from parental custody and released A.W. to mother's custody under the supervision of DCFS.

A combined jurisdiction/disposition hearing was conducted on March 11, 2021.  In several reports filed with the court, DCFS indicated

---

[3]  Before leaving California, mother "dropped of[f] the other children to the father [(E.A.)]; whom [*sic*] is currently being accused of physically assaulting [A.W.]."

[4]  Undesignated statutory references are to the Welfare and Institutions Code.

4

that on September 2, 2020, mother informed a social worker that she, A.W., and her other children "are not safe." When asked to clarify what she meant by not feeling safe, mother told a social worker that father and Lariyha G. were both gang members, and both knew where mother and the children lived. Mother sent DCFS several text messages she had received from father on August 31, 2020. In the August 2020 text messages, father stated: "'hahaha bitch just remember who the fuck you talking to Asia on bloods and I didn't give you permission to move my baby out of state so just iknow [*sic*] I can put a stop to that at any time bitch. I will come get [my] baby when I get out on bloods you can kill yo[urself] for all I give a fuck I'm not first." Mother was told to seek a protective shelter.

As of March 2021, A.W. appeared well bonded to mother and was comfortable living with mother in maternal grandparents' home. Mother indicated that if she received housing assistance, she would not move out of California with A.W. and her other children. Father maintained daily telephone contact with Lariyha G. and weekly telephone contact with A.W. Due to logistical issues with the prison, DCFS's attempts at securing father's interview for this case were unsuccessful. DCFS recommended that A.W. remain in mother's custody with family maintenance services; DCFS did not recommend reunification services for father.

Mother and father appeared for the contested jurisdiction/disposition hearing. The court admitted DCFS's reports into evidence and heard argument from the parties. Father argued that he should be stricken from the petition on two grounds: (1) his conduct

5

was not the cause for intervention by DCFS; and (2) his incarceration and criminal history were not adequate grounds for asserting jurisdiction. Though counsel for DCFS agreed that it would not have intervened "[i]f not for the actions" of mother and E.A., it was only after its initial intervention that DCFS "learned of . . . father's criminal behavior, conviction[s], dangerous behavior, and its [*sic*] relation to harm to [A.W.], and it's obligated to file something when it [saw] a risk of harm, which is—I guess, you can call it self-evident. But it's also based on the fact that [father is] not able to care for his child because of his actions."

Following argument of counsel, the court "adopt[ed] the argument made by [DCFS] with regard to" the section 300, subdivision (b) count alleged against father, and the court sustained the count on those grounds. The court also sustained a section 300, subdivision (b) count regarding E.A.'s physical abuse of A.W. and mother's failure to protect.[5] Proceeding to disposition, the court removed A.W. from father's custody "pursuant to dependency court disposition findings and orders, the terms of which are contained in the minute order,"[6] and released A.W. to mother's custody with family maintenance services. The court ordered father unmonitored weekly telephone visits with A.W.

---

[5] The court dismissed the allegations under subdivision (a) of section 300 that E.A. inflicted serious physical harm on A.W.

[6] The minute order provided that the court found "by clear and convincing evidence, pursuant to . . . sections 361(a)(1), 361(c), 361(d) and 362(a)" that it was "reasonable and necessary to remove the child from the father."

## DISCUSSION

Father contends that the dependency court erred in sustaining the allegation as to him under section 300, subdivision (b), and removing A.W. from his care.

1.    *Justiciability*

As a preliminary matter, DCFS contends that father's appeal is not properly before us. It is undisputed that A.W. remains under the court's jurisdiction based on mother's own conduct. (See *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 ["a jurisdictional finding good against one parent is good against both"].) A single jurisdictional finding supported by substantial evidence is generally sufficient to support dependency jurisdiction and render moot a challenge to any other jurisdictional finding. (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)

We nonetheless retain discretion to consider the merits of a parent's appeal if the jurisdictional finding at issue "(1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction.'" (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763; accord, *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1316–1317.)

Here, father challenges the jurisdictional findings not in isolation, but as predicate findings on which the court removed A.W. from his

7

custody.  We therefore exercise our discretion to review his claims despite the ongoing presence of dependency jurisdiction over A.W.

2.    *Jurisdictional Findings*

Father asserts substantial evidence does not support the juvenile court's jurisdictional findings against him.

As father concedes, our review of the juvenile court's jurisdictional findings is governed by the substantial evidence standard of review.  (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 184.)  Under that standard, we must uphold the court's findings "'unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings.  [Citation.]'" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.)

As relevant here, the juvenile court may assert dependency jurisdiction if the child has "suffered, or there is a substantial risk that the child will suffer, serious physical harm . . . as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or the willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." (§ 300, subd. (b)(1).)

Father asserts that the court's jurisdictional findings against him "cannot stand because they were based solely on his criminal history and incarceration," which he maintains bore no relationship to a risk of harm to A.W.  In support of this argument, father relies exclusively on

8

*In re J.N.* (2021) 62 Cal.App.5th 767 (*J.N.*). However, *J.N.* does not aid father.

As here, the dependency proceedings in *J.N.* arose out of endangering conduct by the mother and her boyfriend while the father of J.N. was incarcerated. (*J.N., supra,* 62 Cal.App.5th at pp. 771–772.) DCFS filed an original petition naming the mother and boyfriend as offending parents, and a subsequent, amended petition alleging father's violent criminal history placed the child at risk of harm. (*Id.* at pp. 772–773.) "As supporting evidence for the allegations [against the father], the jurisdiction/disposition report attached [the father's] court dockets and detailed the results of his [CLETS] report."[7] (*Ibid.*) The report noted an arrest for inflicting corporal injury on a spouse or cohabitant, "which did not result in any further court action [against the father] for a 'reason unknown.'" (*Id.* at p. 773.) The report also included statements by the mother that she had prevented the father from being a part of the child's life, and did not allow the father any contact with the child "'due to his aggressive behavior.'" (*Ibid.*) The juvenile court sustained the jurisdictional findings against the father, "noting [that the father] had 'very serious convictions of crimes that impact child safety and a parent's safety while caring for their child,' including 'one

_____

[7] According to the CLETS reports, the father of J.N. suffered a 2014 conviction for threatening a crime with intent to terrorize and exhibiting a deadly weapon; a 2016 conviction for assault with a deadly weapon; and two 2019 convictions for causing a fire of an inhabited property, and assault with a deadly weapon and by means likely to produce great bodily injury. (*J.N., supra,* 62 Cal.App.5th at p. 773.)

. . . for domestic violence.'" (*Ibid.*)  The court removed J.N. from the father's custody and placed J.N. with the mother.  (*Ibid.*)

On appeal, the father argued, and the appellate court agreed, that the record did not support the jurisdictional findings that the father's incarceration and criminal history placed J.N. at substantial risk of harm.  (*J.N.*, *supra*, 62 Cal.App.5th at pp. 775.)  The court reasoned that while "a parent's past violent criminal conduct will be highly relevant in determining the likelihood of violence to a child in the future," there must be "some nexus between the past violence and some likely future violence that could endanger the child." (*Id.* at p. 776.)  To determine whether such a nexus existed, the court considered whether the father had committed crimes of domestic violence or crimes involving children; whether the father had fought or interfered with efforts by the mother "to shield" the child from the father's criminal lifestyle; and whether the father failed to protect the child from an abusive situation of which he knew or should have known. (*Id.* at p. 776.)  Finding no evidence to support these factors, the court determined that there was no nexus between the father's conduct and potential harm to J.N., thereby compelling the reversal of the jurisdictional findings under section 300, subdivision (b).  (*Ibid.*)

Here, by contrast, father was convicted of a crime of domestic violence (i.e., battery of a current or former spouse).  Father was also in contact with A.W. (through weekly telephone communication), and he attempted to interfere with mother's efforts to shield A.W. from father's criminal lifestyle.  Father's threat "on bloods" to stop mother from moving out of California with A.W. confirmed mother's report that he

10

was gang affiliated, and reasonably suggests father could carry out this threat from prison. Moreover, it does not appear that father ever inquired about the adequacy of care A.W. was receiving. Instead, he left A.W. in an environment in which the child was physically abused, exposed to domestic violence and drug use, and left unsupervised for extended periods of time. Viewing the record in totality, we therefore conclude that substantial evidence supports the findings that father's criminal history, incarceration, and dangerous behavior placed A.W. at substantial risk of suffering physical harm. (Accord, *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16; *In re James C.* (2002) 104 Cal.App.4th 470, 483.)

3.    *Disposition Order*

Father also challenges the sufficiency of the evidence to support the order removing A.W. from his custody.[8]

"After the juvenile court has assumed jurisdiction, the court is required to hear evidence on the question of the proper disposition to be made of the child." (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345

---

[8]    In his opening brief, father alleged that the juvenile court committed reversible error by failing to state a factual basis for its removal order. (See § 361, subd. (e) [the juvenile court "shall state the facts on which the decision to remove the minor is based"].) Father did not raise an objection on this basis at the contested jurisdiction/disposition hearing, and he provided no response in his reply brief to DCFS's argument that his failure to object below forfeited the issue on appeal. We presume father has conceded he forfeited the issue. (See *In re John M.* (2013) 217 Cal.App.4th 410, 419, abrogated on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 628; *Dills v. Redwood Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1.)

11

(*Anthony Q.*).)  To remove a child from a parent with whom the child did not reside at the time the petition was initiated, the court must find by clear and convincing evidence that there would be a substantial danger to the health, safety, protection, or well-being of the child for the parent to live with the child or otherwise exercise the parent's right to physical custody, and there are no reasonable means by which the child's health can be protected without removing the child from parental custody. (§ 361, subd. (d).)

For an incarcerated parent, "[t]he test must therefore be whether [the parent] 'otherwise exercis[ing his or her] . . . right to physical custody' [citation]—for example, by making arrangements for [the child's] living situation while [the parent] is still in prison—would create the requisite substantial risk." (*J.N.*, *supra*, 62 Cal.App.5th at p. 778.)  Because the focus of disposition is on averting harm to the child, the parent need not be dangerous, and the minor need not have been harmed before ordering the child removed from parental custody. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

On review of a finding that has been "proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*); cf. *In re V.L.* (2020) 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].)

Here, father asserts the record is insufficient to support the requisite findings that he intended to exercise his physical custody over

12

A.W., and even assuming he did intend to exercise that right, he contends insufficient evidence supports a finding that he would place A.W.'s health or well-being in substantial danger.

The intent of father to exercise physical custody over A.W. is readily established by his recent threats to control A.W.'s living situation. Upon learning of mother's plan to move out of state with A.W., father sent mother several threatening text messages from prison. In those messages, father declared that he did not "give [mother] permission to move my baby"; he could "put a stop to [the move] at any time"; and he would "come get [my] baby when I get out on bloods." It is clear from these messages that father, if given the opportunity, would exercise his physical custody over A.W. either individually (if he was let out of prison), or by making his own arrangements while in prison. (See *In re Isayah C.* (2004) 118 Cal.App.4th 684, 700 ["a parent may have custody of a child, in a legal sense, even while delegating the day-to-day care of that child to a third party"].)

Ample evidence also supports the finding that if father were to exercise his right to physical custody over A.W., he would create the requisite substantial risk. Father is gang affiliated and is serving a lengthy prison sentence for unlawfully killing another person. (See *In re D.B.* (2018) 26 Cal.App.5th 320, 332 [courts may consider as relevant the parent's past conduct and current circumstances].) Prior to his current conviction, father was convicted of assaulting a current or former spouse, a fact suggesting the likelihood that "future violence . . . could endanger the child." (*J.N., supra*, 62 Cal.App.5th at p. 776.)

13

Father's violent criminal history, his continued ties to gang culture, and his recent threats to forcibly control A.W.'s living situation support the order "removing" A.W. from his custody—"that is, limiting [father's] control of the child, including the right to determine [A.W.'s] placement." (*Anthony Q., supra*, 5 Cal.App.5th at p. 354.)

## DISPOSITION

The jurisdictional findings and disposition order are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

MANELLA, P. J.

CURREY, J.